Paul **LEWIS**, d/b/a Lewis Lumber Company, Appellee,

v.

**MOBIL OIL CORPORATION**, a Corporation, Appellant.

No. 20244.

United States Court of Appeals, Eighth Circuit.

Jan. 7, 1971.

Rehearings Denied Feb. 16, 1971.

Ronald L. Neill, Dallas, Tex., John C. Calhoun, Jr., Owens, McHaney & McHaney, Little Rock, Ark., for appellant; E. L. McHaney, Little Rock, Ark., of counsel.

Daily, West, Core & Coffman, Fort Smith, Ark., for appellee; Ben Core, Fort Smith, Ark., of counsel.

Before MATTHES, Chief Judge, MEHAFFY and GIBSON, Circuit Judges.

GIBSON, Circuit Judge.

In this diversity case the defendant appeals from a judgment entered on a jury verdict in favor of the plaintiff in the amount of $89,250 for damages alleged to be caused by use of defendant's oil.

Plaintiff Lewis has been doing business as a sawmill operator in Cove, Arkansas, since 1956. In 1963, in order to meet competition, Lewis decided to convert his power equipment to hydraulic equipment. He purchased a hydraulic system in May 1963, from a competitor who was installing a new system. The used system was in good operating condition at the time Lewis purchased it. It was stored at his plant until November 1964, while a new mill building was being built, at which time it was installed. Following the installation, Lewis requested from Frank Rowe, a local Mobil oil dealer, the proper hydraulic fluid to operate his machinery. The prior owner of the hydraulic system had used Pacemaker oil supplied by Cities Service, but plaintiff had been a customer of Mobil's for many years and desired to continue with Mobil. Rowe said he didn't know what the proper lubricant for Lewis' machinery was, but would find out. The only information given to Rowe by Lewis was that the machinery was operated by a gear-type pump; Rowe did not request any further information. He apparently contacted a Mobil representative for a recommendation, though this is not entirely clear, and sold plaintiff a product known as Ambrex 810. This is a straight mineral oil with no chemical additives.

Within a few days after operation of the new equipment commenced, plaintiff began experiencing difficulty with its operation. The oil changed color, foamed over, and got hot. The oil was changed a number of times, with no improvement. By late April 1965, approximately six months after operations with the equipment had begun, the system broke down, and a complete new system was installed. The cause of the breakdown was undetermined, but apparently by this time there was some suspicion of the oil being used. Plaintiff Lewis requested Rowe to be sure he was supplying the right kind of oil. Ambrex 810 continued to be supplied.

From April 1965 until April 1967, plaintiff continued to have trouble with the system, principally with the pumps which supplied the pressure. Six new pumps were required during this period, as they continually broke down. During this period, the kind of pump used was a Commercial pump which was specified by the designer of the hydraulic system. The filtration of oil for this pump was by means of a metal strainer, which was cleaned daily by the plaintiff in accordance with the instruction given with the equipment.

In April 1967, the plaintiff changed the brand of pump from a Commercial to a Tyrone pump. The Tyrone pump, in-

stead of using the metal strainer filtration alone, used a disposable filter element in addition. Ambrex 810 oil was also recommended by Mobil and used with this pump, which completely broke down three weeks later. At this point, plaintiff was visited for the first time by a representative of Mobil Oil Corporation, as well as a representative of the Tyrone pump manufacturer.

On the occasion of this visit, May 9, 1967, plaintiff's system was completely flushed and cleaned, a new Tyrone pump installed, and on the pump manufacturer's and Mobil's representative's recommendation, a new oil was used [1] which contained certain chemical additives, principally a "defoamant." Following these changes, plaintiff's system worked satisfactorily up until the time of trial, some two and one-half years later.

Briefly stated, plaintiff's theory of his case is that Mobil supplied him with an oil which was warranted fit for use in his hydraulic system, that the oil was not suitable for such use because it did not contain certain additives, and that it was the improper oil which caused the mechanical breakdowns, with consequent loss to his business. The defendant contends that there was no warranty of fitness, that the breakdowns were caused not by the oil but by improper filtration, and that in any event there can be no recovery of loss of profits in this case.

## I. THE EXISTENCE OF WARRANTIES

Defendant maintains that there was no warranty of fitness in this case, that at most there was only a warranty of merchantability and that there was no proof of breach of this warranty, since there was no proof that Ambrex 810 is unfit for use in hydraulic systems generally. We find it unnecessary to consider whether the warranty of merchanta-

bility was breached, although there is some proof in the record to that effect, since we conclude that there was a warranty of fitness.

Plaintiff Lewis testified that he had been a longtime customer of Mobil Oil, and that his only source of contact with the company was through Frank Rowe, Mobil's local dealer, with whom he did almost all his business. It was common knowledge in the community that Lewis was converting his sawmill operation into a hydraulic system. Rowe knew this, and in fact had visited his mill on business matters several times during the course of the changeover. When operations with the new machinery were about to commence, Lewis asked Rowe to get him the proper hydraulic fluid. Rowe asked him what kind of a system he had, and Lewis replied it was a Commercial-pump type. This was all the information asked or given. Neither Lewis nor Rowe knew what the oil requirements for the system were, and Rowe knew that Lewis knew nothing more specific about his requirements. Lewis also testified that after he began having trouble with his operations, while there were several possible sources of the difficulty the oil was one suspected source, and he several times asked Rowe to be sure he was furnishing him with the right kind.

Rowe's testimony for the most part confirmed Lewis'. It may be noted here that Mobil does not contest Rowe's authority to represent it in this transaction, and therefore whatever warranties may be implied because of the dealings between Rowe and Lewis are attributable to Mobil. Rowe admitted knowing Lewis was converting to a hydraulic system and that Lewis asked him to supply the fluid. He testified that he did not know what should be used and relayed the request to a superior in the Mobil organization, who recommended Ambrex 810. This is what was supplied.

---

[1]. Upon recommendation of Mobil, plaintiff used Mobil's DTE 23 and Del Vac Special after the second Tyrone was installed in May 9, 1967, until July 25, 1967, when plaintiff changed to Pace-

maker XD–15. All of the above oils contained certain chemical additives for anti-wear, anti-oxidation and anti-foaming.

When the first Tyrone pump was installed in April 1967, Rowe referred the request for a proper oil recommendation to Ted Klock, a Mobil engineer. Klock recommended Ambrex 810. When this pump failed a few weeks later, Klock visited the Lewis plant to inspect the equipment. The system was flushed out completely and the oil was changed to DTE–23 and Del Vac Special containing several additives. After this, no further trouble was experienced.

■ This evidence adequately establishes an implied warranty of fitness. Arkansas has adopted the Uniform Commercial Code's provision for an implied warranty of fitness:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." 7C Ark.Stat.Ann. § 85–2–315 (1961).

Under this provision of the Code, there are two requirements for an implied warranty of fitness: (1) that the seller have "reason to know" of the use for which the goods are purchased, and (2) that the buyer relies on the seller's expertise in supplying the proper product. Both of these requirements are amply met by the proof in this case. Lewis' testimony, as confirmed by that of Rowe and Klock, shows that the oil was purchased specifically for his hydraulic system, not for just a hydraulic system in general, and that Mobil certainly knew of this specific purpose. It is also clear that Lewis was relying on Mobil to supply him with the proper oil for the system, since at the time of his purchases, he made clear that he didn't know what kind was necessary.

Mobil contends that there was no warranty of fitness for use in his particular system because he didn't specify that he needed an oil with additives, and al-

ternatively that he didn't give them enough information for them to determine that an additive oil was required. However, it seems that the circumstances of this case come directly within that situation described in the first comment to this provision of the Uniform Commercial Code:

"1. Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting. Under this section the buyer need not bring home to the seller *actual knowledge of the particular purpose* for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists." 7C Ark.Stat.Ann. § 85–2–315, Comment 1 (1961) (emphasis added).

Here Lewis made it clear that the oil was purchased for his system, that he didn't know what oil should be used, and that he was relying on Mobil to supply the proper product. If any further information was needed, it was incumbent upon Mobil to get it before making its recommendation. That it could have easily gotten the necessary information is evidenced by the fact that after plaintiff's continuing complaints, Mobil's engineer visited the plant, and, upon inspection, changed the recommendation that had previously been made.

■ Additionally, Mobil contends that even if there were an implied warranty of fitness, it does not cover the circumstances of this case because of the abnormal features which the plaintiff's system contained, namely an inadequate filtration system and a capacity to entrain excessive air. There are several answers to this contention. First of all, the contention goes essentially to the question of causation—i. e., whether the damage was caused by a breach of warranty or by some other cause—and not to the existence of a warranty of fitness in the first place. Secondly, assuming

that certain peculiarities in the plaintiff's system did exist, the whole point of an implied warranty of fitness is that a product be suitable for a specific purpose, and that a seller should not supply a product which is not so suited. Thirdly, there is no evidence in the record that the plaintiff's system was unique or abnormal in these respects. It operated satisfactorily under the prior owner, and the new system has operated satisfactorily after it was adequately cleaned and an additive type oil used.

While we will discuss these problems more completely in the question of causation, it may be briefly noted here that the proof shows that plaintiff's filtration system was installed and maintained in strict accordance with the manufacturer's recommendations, that this was a standard system, and that any hydraulic system has a certain unavoidable capacity to entrain air. While a "perfect" system which is run 24 hours a day might not have any air in it, in actual practice there are at least two sources of air. One is from minute leaks in "packing glands." The other source arises from the fact that when the system is shut down, as at night and over the lunch hour, as well as for repairs, the oil drains out of the system and into the reservoir. When the system is started up again, air which has entered the system to replace the drained oil must be dissipated. This dissipation occurs by running the system for a few minutes and is affected by the capacity of the oil to rid itself of air bubbles. It is sufficient to note here that there was no evidence that the plaintiff's system was in any way unique in this respect. Thus, Mobil's defense that there was no warranty of fitness because of an "abnormal use" of the oil is not appropriate here.

## II. BREACH OF WARRANTY AS THE CAUSE OF PLAINTIFF'S DAMAGE

■ The primary controversy in this case is whether the damage done to the plaintiff's hydraulic system was caused by the defendant's breach of warranty in failing to provide a proper oil. This issue primarily presents a question of the sufficiency of the evidence to support the jury's verdict that the cause of the plaintiff's damage was the use of Ambrex 810 and that Ambrex 810 was an improper oil for his system. Of course, on appeal the evidence must be viewed in the light most favorable to the jury verdict, and we think there was sufficient evidence to support the verdict on the breach of warranty issue. An understanding of the evidence in this case will be facilitated by a brief explanation of each party's theory of the cause of damage.

■ Plaintiff's theory was that the damage was caused by pump cavitation induced by the failure of the oil to expurgate air bubbles quickly enough from its body, and that this characteristic of the oil could have been prevented by the addition of proper additives, principally a defoamant additive, but also anti-wear, anti-oxidation, and anti-rust additives.

Pump cavitation occurs when air bubbles in the body of the oil are sucked into the pump along with the hydraulic fluid. The moving parts within the pump have very small tolerances and must be kept lubricated at all times by the hydraulic fluid. Due to the exceedingly high pressures within the pump, when there are air bubbles in the fluid, they become compressed into larger bubbles and at some point interfere with the lubricating qualities of the oil, permitting the metal parts of the pump to come in contact. When this contact occurs, small metal pieces flake off and get into the fluid, which then disperses these metal contaminants throughout the system. These metal particles can in turn be responsible for causing other problems in the system which would result in the introduction of atmospheric contamination—i. e., dirt—into the system. As the metal particles, plus the other contamination, are circulated throughout the system by means of the hydraulic fluid and returned to the pump intake, serious damage is caused to the pump which cannot tolerate these contaminants.

According to the plaintiff's theory, this process can be prevented by the addition of an anti-foamant additive in the oil which aids it in expurgating air quickly so that air bubbles are not sucked into the pump in the first place.

Defendant's theory of the cause of damage was that plaintiff failed to maintain his equipment properly, failed to have a proper filtration system, and failed to flush the system after pump failures. Defendant also contested plaintiff's allegations that a defoamant additive in the oil would prevent damage from pump cavitation.

The following brief summary of the evidence on these theories demonstrates that there was adequate proof in the record to sustain the jury's verdict on the breach of warranty issue.

The above description of the theory of cavitation was testified to in substance by plaintiff's expert witness Edwards. This witness also testified that it was his opinion that plaintiff's trouble with his system was caused by pump cavitation, and the cavitation damage was caused by the use of Ambrex 810. It was his further opinion that Ambrex 810 caused pump cavitation because of its failure to have suitable additives which could have prevented this damage and that Ambrex 810 was unsuitable for use in equipment of this type. Edwards' credentials as an expert are not challenged in this case, and this opinion evidence was entitled to be considered by the jury.

Another expert witness for the plaintiff also testified that a non-additive oil such as Ambrex 810 was unsuitable for use in plaintiff's equipment and that an additive oil was necessary. The manufacturer of plaintiff's equipment testified similarly. The jury was also entitled to consider the fact that when a Mobil engineer actually visited plaintiff's mill and saw the equipment, he changed his oil recommendation to one containing additives. Further circumstantial evidence that the oil was the cause of the problems was the fact that once the system was flushed and additive oil was used, the system thereupon functioned satisfactorily.

Against the foregoing evidence, the defendant presented the following evidence. First, two expert witnesses testified that, using new samples of oil, Ambrex 810 performed as well as or better than an additive oil on certain standard laboratory tests of foam dissipation and air release qualities. Plaintiff's expert witness testified in rebuttal that such tests were not indicative of how the two oils would perform in actual operation, because once they had actually been "worked" the non-additive oil (Ambrex 810) underwent certain chemical changes which would affect these qualities, while the chemicals in the additive oil would counteract these changes so as not to affect the qualities so much.

Defendant also presented testimony from a sawmill operator using equipment made by the same manufacturer as plaintiff's that he used "pipeline drip" as his hydraulic fluid and that his equipment operated satisfactorily. Apparently the inference to be drawn here was that the quality of oil used as hydraulic fluid was not important to the proper operation of the equipment. However, plaintiff was able to establish on rebuttal that this "pipeline drip" was in fact a lubricating oil which contained all the chemical additives which were needed and missing in Ambrex 810.

The defendant contended that the cause of the plaintiff's trouble was his failure to have an adequate filtration process on his equipment to clean the oil. Some of the defense witnesses testified that metal strainers were not sufficient and that paper filters were necessary. The evidence on this point is somewhat unsatisfactory, because no attempt was made by the defense to make distinctions between the kinds of pumps used by the plaintiff. Plaintiff admits that as to the Tyrone pumps which were used in the later stages of operation, paper filters were required by the manufacturer, but it is uncontested that they were used on these pumps. The system originally

operated with Commercial pumps. The manufacturer of that equipment testified that with these pumps only metal strainers were used, not paper filters, and that he had installed many systems which worked satisfactorily under these circumstances so long as the proper oil was used. While the evidence on this issue is conflicting, we think the jury was entitled to conclude, as it obviously did, that inadequate filtration was not the cause of plaintiff's trouble.

The defendant also contended that plaintiff's trouble was caused by a failure to flush his system thoroughly after a pump failure, and that sufficient contaminants remained in the system to cause the subsequent failures, instead of the oil being the cause. Again the evidence on this point is not entirely clear, but the force of this contention is considerably vitiated by the fact that one of the failures occurred shortly after the installation of an entirely new system. It seems evident that this system was cleaner than one which would have been merely flushed, and yet it did not operate satisfactorily with Ambrex 810.

We conclude that there was adequate evidence to sustain the jury's verdict that plaintiff's damage was caused by the breach of warranty.

### III. DAMAGES

The question with which we are here confronted is what damages are recoverable by the plaintiff for the defendant's breach of warranty. The applicable statutes are §§ 2–714(2), (3) and 2–715 of the Uniform Commercial Code, 7C Ark. Stats.Ann. §§ 85–2–714(2), (3), 85–2–715 (1961), which provide in pertinent part:

"*85–2–714.* * * *

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a proper case any incidental and consequential damages under the next section may also be recovered."

"*85–2–715. Buyer's incidental and consequential damages.*—

"(1) Incidental damages resulting from the seller's breach include * * * any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

"(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"(b) injury to person or property proximately resulting from any breach of warranty."

In the instant case the ordinary measure of damages for breach of warranty is not applicable, since the plaintiff-buyer did not pay a price exceeding the value of the goods delivered. Rather, since the breach was of an implied warranty of fitness for a particular purpose, the "special circumstances" exception is applicable here. The proximate damages in this case consisted of the plaintiff's incidental and consequential damages which may be recoverable. The incidental damages consist of the excessive amounts of oil used in the system and the costs incurred in the repair and replacement of mechanical parts damaged by the oil's failing to function properly. There is no controversy between the parties as to the allowability of these damages. There are two major points of controversy on damages: (1) for what period of time are damages recoverable and (2) whether loss of profits during the time plaintiff was unable to operate at full capacity are recoverable.

The plaintiff was allowed to recover damages, including both direct expenses and loss of profits, for the period of approximately two and one-half years

during which he was attempting to operate with Ambrex 810. In addition, he recovered loss of profits for an approximately two and one-half year period following the discovery of the unsuitability of Ambrex 810, during which time he was using an additive oil which apparently is satisfactory. The theory of this latter amount of damages is that during the period of operation with Ambrex 810, he experienced so much expense and shut-down time at his mill that at the end of that period he was practically bankrupt. His capital situation was such that during the following two years, even though he was no longer using Ambrex 810 and was making a substantial profit, he was unable to finance his operations at more than 50 to 60 per cent capacity. There is some proof in the record that had he been operating at 100 per cent capacity, there would have been a market for his production. He argues that the loss of profits on this lost production is the direct result of the breach of warranty and hence recoverable.

■ This appears to be a unique theory. We have been unable to discover any cases even remotely in point, but it appears to us to be without merit. The failure to produce at full capacity during the period when he was not using Ambrex 810 was not due to a breach of warranty but was clearly due to the plaintiff's capital resources. The defendant oil company cannot be held responsible for the capitalization of plaintiff's business. If it is indeed the case, as plaintiff contends, that there was a readily available market for his extra production at a reasonable profit, surely there were conventional sources available to finance this production. The defendant is not in the business of extending credit to manufacturing enterprises and should not be held liable for these alleged damages.

■ A more troublesome question is whether the plaintiff should be allowed to recover damages for the full two and one-half year period during which he was using Ambrex 810. Under § 2–715 (2) (a) of the Uniform Commercial Code, only those losses are recoverable "which could not reasonably be prevented by cover or otherwise." 7C Ark.Stat. Ann. § 85–2–715 (1961). The "cover" provision of the Uniform Commercial Code, § 2–712, is not applicable here, since that section applies to the buyer's remedies upon failure of the seller to deliver goods or upon the rightful rejection of goods known to be defective. Hence the question here is whether the plaintiff's damage could otherwise have been reasonably prevented. The applicable doctrine is stated by Professor Williston:

"* * * [D]amages which the plaintiff might have avoided with reasonable effort without undue risk, expense, or humiliation are either not caused by the defendant's wrong or need not have been, and, therefore, are not to be charged against him.

"The principle has wide application and frequently involves the establishment of a standard of reasonable conduct.

* * * * * *

"Where inferior goods have been furnished under a contract, the buyer cannot recover greater consequential damages caused by using them when he knew of their unfitness, than would have been caused by another possible course, although the seller had sold the goods for that purpose. And the principle is general that there can be no recovery for consequences that reasonably could have been avoided." 11 S. Williston, Contracts § 1353 (Jaeger, 3d ed. 1968) (footnotes omitted).

See Wawak v. Stewart, Ark., 449 S.W.2d 922 (1970); Taylor v. Wilson, 109 Ga. App. 658, 137 S.E.2d 353 (1964); Oakland Metal Stamping Co. v. Forest Industries, Inc., 352 Mich. 119, 89 N.W.2d 503 (1958); 5 A. Corbin, Contracts §§ 1039, 1040 (1964).

Defendant's argument on this issue is not precise, but the gist of its complaint is that the plaintiff used Ambrex 810 for a period of two and one-half years, during which time there was at least some suspicion that the oil was not functioning properly, and that plaintiff should have taken steps to solve his problems sooner than he did. It is unclear to us whether or not the defendant is contending that the plaintiff used Ambrex 810 with actual knowledge of its unfitness, so as to preclude at least in part his recovery of damages caused by its use. If such is the claim, it is clearly refuted by the evidence. Neither plaintiff nor the Mobil dealer who sold him Ambrex 810 knew the chemical composition of the oil nor what the exact requirements of plaintiff's equipment were. Plaintiff was relying on Mobil to provide him with the proper oil and it was not discovered during that time that the oil was improper. Indeed, plaintiff changed the brand of pump he was using because of the possibility that the problem was mechanical. It was not until a Mobil engineer visited the mill and changed the type of oil recommended that it was discovered that an improper oil had been supplied.

Neither does the defendant precisely phrase its argument in terms of a failure to give timely notice under Ark. Stat.Ann. § 85–2–607, although it relies on an Arkansas case under this section, Ingle v. Marked Tree Equipment Co., 244 Ark. 1166, 428 S.W.2d 286 (1968). However, it seems that under the circumstances of this case, the reasonable notice required by this section was given by the plaintiff. Pertinent here is Official Comment 4 to Uniform Commercial Code § 2–607:

"4. The time of notification is to be determined by applying commercial standards to a merchant buyer. 'A reasonable time, for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designed to

defeat commercial bad faith, not to deprive a good faith consumer of his remedy.

"The content of the notification, need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer * * *.'" 7C Ark.Stat. Ann. § 85–2–607, Comment 4 (1961).

Here there is not the slightest suggestion of bad faith on the part of the plaintiff. Furthermore the evidence shows that soon after using Ambrex 810, plaintiff notified the Mobil dealer, Rowe, that he wasn't sure if a proper oil was being supplied, and was constantly in touch with Rowe about his problems thereafter. Mobil certainly had notice that the "transaction [was] still troublesome and must be watched." Defendant continued to supply Ambrex 810. Therefore we cannot conclude that any damages must be barred under this section. *See* Boeing Airplane Co. v. O'Malley, 329 F.2d 585, 593–596 (8th Cir. 1964). The trial judge properly instructed the jury that the plaintiff must have notified the defendant within a reasonable time after he should have discovered the breach, and we cannot say that the jury's verdict was erroneous in this respect.

The only way in which it would have been possible for plaintiff's damages to have been minimized in this case would have been for him to have brought in an independent expert to assess the cause of his trouble. While such a course might have been desirable, and would probably have saved both plaintiff and defendant considerable expense, we cannot say that failure to do so requires a reduction of damages allowable under § 2–715 of the Uniform Commercial Code as a matter of law. This is essentially a question of the plaintiff's duty to use diligence to minimize his damages, which is ordinarily a ques-

tion of fact for the jury. The trial judge properly instructed the jury that plaintiff had the duty to use diligence to minimize his damages, that defendant was not liable for any damages which resulted from plaintiff's failure to minimize his damages, and that diligence meant the care of a reasonably careful person under the circumstances of the case. The jury's verdict reflects its finding that the plaintiff had acted reasonably in these circumstances, and again we cannot say that it lacks evidentiary support.

Plaintiff was in continuous contact with both the manufacturer of his equipment and with the defendant in an effort to ascertain the cause of his problems. Various remedies were tried and failed until the oil problem was ultimately identified. Throughout this period, defendant continued to supply plaintiff with Ambrex 810, knowing both of his reliance on it to supply the proper oil and his difficulties in operation. Thus we do not think that defendant can rely on plaintiff's failure to obtain an independent opinion to absolve it of liability for its breach of warranty. "The duty to mitigate damages is not an unlimited one * * *." Steele v. J. I. Case Company, 197 Kan. 554, 419 P.2d 902, 911 (1966). We conclude that defendant should be liable for all of plaintiff's damages during the period he was using Ambrex 810.

■ The final question to be determined is whether under Arkansas law, loss of profits may be recovered as consequential damages for breach of warranty. Defendant relies on a series of Arkansas cases which stand for the proposition that loss of profits cannot be recovered unless the circumstances of the transaction are such as to make it reasonable to assume that the defendant knew he was to be held responsible for such damages and agreed to such liability. *See* Hawkins v. Delta Spindle of Blytheville, Inc., 245 Ark. 830, 434 S.W. 2d 825 (1968); Lamkins v. International Harvester Co., 207 Ark. 637, 182 S.W.2d

203 (1944); Hooks Smelting Co. v. Planters' Compress Co., 72 Ark. 275, 79 S.W. 1052 (1904). The problem with this argument is that all of these cases are non-Code cases which rely on a rule which is expressly rejected by the Uniform Commercial Code Official Commentary to § 2–715:

"2. * * * The 'tacit agreement' test for the recovery of consequential damages is rejected. * * *

"3. * * * It is not necessary that there be a conscious acceptance of an insurer's liability on the seller's part, nor is his obligation for consequential damages limited to cases in which he fails to use due effort in good faith.

"Particular needs of the buyer must generally be made known to the seller while general needs must rarely be made known to charge the seller with knowledge.

"Any seller who does not wish to take the risk of consequential damages has available the section on contractual limitation of remedy." 7C Ark.Stat. Ann. § 85–2–715, Comments 2 and 3 (1961).

The question essentially is whether lost profits are damages which the seller had reason to know of at the time the contract was made. With respect to breach of warranty, lost profits are held to be foreseeable if they are proximately caused by and are the natural result of the breach. 5 A. Corbin, Contracts § 1012 (1964); Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 148–149 (1965). *Cf.* Superwood Corp. v. Larson-Stang, Inc., 311 F.2d 735 (8th Cir. 1963). Where a seller provides goods to a manufacturing enterprise with knowledge that they are to be used in the manufacturing process, it is reasonable to assume that he should know that defective goods will cause a disruption of production, and loss of profits is a natural consequence of such disruption. Hence, loss of profits should be recoverable under those circumstanc-

es. Here, the defendant seller knew that the oil it was supplying to plaintiff was to be used in the operation of the sawmill. It also knew that a defective oil would cause the sawmill equipment to operate improperly. It is a natural consequence of the failure of the equipment to function that production would be curtailed and loss of profits would follow. *See* 5 A. Corbin, Contracts § 1013, p. 92 (1964). We think these damages are the proximate result of the breach and should be recoverable.

Most jurisdictions which have considered the question of the recoverability of lost profits under the Uniform Commercial Code for a breach of warranty in circumstances similar to those in the instant case seem to have allowed them. *See* Kokomo Opalescent Glass Company, Inc. v. Arthur W. Schmid International Inc., 371 F.2d 208, 214–215 (7th Cir. 1966); Earle M. Jorgensen Co. v. Tesmer Manufacturing Co., 10 Ariz.App. 445, 459 P.2d 533, 537–538 (1969); Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal. Rptr. 17, 403 P.2d 145, 148–149 (1965); Western Feed Co. v. Heidloff, 230 Or. 324, 370 P.2d 612, 619 (1962). *But see* Comet Industries, Inc. v. Best Plastic Container Corp., 222 F.Supp. 723, 730 (D.Colo.1963); Keystone Diesel Engine Co. v. Irwin, 411 Pa. 222, 191 A.2d 376, 379 (1963).

We think Arkansas would follow this rule. While there are no Arkansas cases on breach of warranty under the Code which involve facts directly analogous to those in this case, there are two cases which appear to have allowed loss of profits, measured by the value of the lost crop, resulting from the breach of warranty of quality of seed. Dessert Seed Co. v. Drew Farmers Supply, Inc., Ark., 454 S.W.2d 307 (1970); L. A. Green Seed Co. of Arkansas v. Williams, 246 Ark. 454, 438 S.W.2d 717, 720 (1969); *see also* Carroll v. Jones, 237 Ark. 361, 373 S.W.2d 132, 135 (1963) (a non-Code case).

Defendant also contends there was no proper proof of lost profits in this case,

and that the damages were purely speculative. We do not agree. While it is true that the damages were excessive in this case because they were allowed for an improper time period, we do not think that the method utilized was unreasonable under the circumstances of this case. First of all, the plaintiff offered considerable evidence that there was a substantial market for his lumber which he was not able to supply. Evidence was offered of a number of customers who testified they would have bought more of his lumber had it been available. A substantial part of plaintiff's business was done as an exclusive supplier of timbers to a bridge building company. Plaintiff was the only sawmill operator who would furnish these timbers with the close tolerances demanded; he was unable to supply all of that customer's needs.

In addition to this market evidence, there is evidence of the profits made by his business both before and after using Ambrex 810. These were substantial, even in the later period when he was unable to operate at full capacity. During the period he was using Ambrex 810 they were significantly less, due to the lost production and added expenses. Past profits of an established business may be utilized to prove loss of profits as an element of damages. 5 A. Corbin, Contracts § 1023 (1964); 11 S. Williston, Contracts § 1346A (Jaeger, 3d ed. 1968). And under the circumstances of this case, we think the jury was entitled to take account of the profits earned by plaintiff once the business was operating successfully after the breach of warranty. While the lost profits could not be proved with absolute certainty of course, we think a reasonable approximation can be made from the evidence in this case.

To summarize our decision in this case, having reviewed the evidence as a whole and the instructions of the able trial judge, we conclude that there was a warranty of fitness for a particular purpose in this case, that the warranty was breached, and that the defendant was lia-

ble for the damages caused by this breach, including loss of profits during the time plaintiff was using Ambrex 810. Defendant is not liable for any loss of profits which may have occurred after plaintiff quit using Ambrex 810. The jury's verdict was in the single amount of $89,250. We are unable to determine from the record what would be a proper amount to award for direct damages plus loss of profits for the appropriate time period. Therefore, the judgment must be reversed and remanded for a new trial on the issue of damages.

### On Petitions for Rehearing.

■ The petitions for rehearing of both the appellant and the appellee raise questions as to the issue of damages for loss of profits which merit some further comment. At the outset, we would note that the record and the arguments are not entirely clear as to how this element of damages was submitted in this particular case. While we adhere to our opinion that loss of profits is a proper element of damages in a case of this sort, these damages must of course be proved with a certain degree of specificity. For the purposes of this memorandum we will discuss the damages in this case in round figures approximating those in the record.

Plaintiff's profit records show that for the four years prior to his shift to new equipment and using Ambrex 810, he made a total profit of $32,000. In 1961, his profit was $19,000, in 1962, $7,000, in 1963, $8,000, and in 1964, the year in which he was converting his equipment, he had a loss of $2,000. This works out to an annual rate of profits in the pre-Ambrex period of $8,000, and we are not saying that any particular period of time prior to the period the damage was sustained should be used as the basis for calculation. It appears obvious that the immediate prior year's profit has more relevancy to the issue of what profits might be anticipated in the following years than do the more remote years' profits. Likewise, on the other end of

the calculation the immediate succeeding year's profit after the use of Ambrex was discontinued would be of greater relevancy than the succeeding years. But even eliminating the year of conversion, this is an annual rate of $11,000. During the period he was using Ambrex 810, approximately 30 months, he made a total of $12,000, for an annual rate of $4,800. In the post-Ambrex period, a period of 24 months, he made a total of $41,000, for an annual rate of approximately $20,500.

■ The jury verdict in this case was for $89,250, of which approximately $9250 may be attributed to direct damages, leaving $80,000 as the recovery for loss of profits. As we will shortly demonstrate, such a recovery, if it is interpreted as being limited to loss of profits for only the period in which Ambrex 810 was being used, bears no reasonable relationship to the proof in the record of plaintiff's capacity for making profits, with or without Ambrex 810. We were thus confronted with the problem of determining what the basis of this recovery was. We were led by certain arguments made in plaintiff's brief to the conclusion that this recovery represented a loss of profits during the period Ambrex 810 was used, plus a loss of profits for the period of time after Ambrex 810 was used because of his inability to operate at full capacity. We held that such later profits could not be recovered. Plaintiff now contends that the loss of profits recovery did not extend to the later period and was confined to the period in which he was using Ambrex 810. We accept this interpretation of the damage award and find this award is excessive.

■ If the $80,000 loss of profits is confined to the 30-month period during which Ambrex 810 was used, to this figure must be added the $12,000 in profits which he actually made. This works out to an annual rate of profits of approximately $37,000. There simply is no proof in the record that plaintiff has ever approached such a profit record. Plaintiff argues that his post-Ambrex

profit rate, during which he was operating at 50–60 per cent capacity must be inflated to a 100 per cent capacity rate in order to determine his profit rate during the time he was using Ambrex 810. We cannot agree that such a method of determining loss of profits is acceptable, for this accomplishes much the same result as that we disapproved in our original interpretation of the damage award —i. e., it penalizes the defendant Mobil Oil Company for the plaintiff's capital structure and bears no reasonable relationship to actual damages caused by the use of Ambrex 810.

We further wish to emphasize the fact that nothing said in our prior opinion should be taken to mean that the profit rate made in the post-Ambrex period is the sole measure of damages in the period of the use of Ambrex 810. In view of the immediate proximity in time of these two periods, the significant increase in profits in the post-Ambrex period is highly suggestive of the fact that additional profits could have been made in the period Ambrex was used, and may be used as a guide as to what those profits should have been, at least as to their outer limit. However, there is also proof in the record that the market conditions of the plaintiff's business were not entirely similar, particularly in the fact that the selling price for lumber was fluctuating.

Plaintiff's recovery for a loss of profits must take into account these different market conditions, his actual production capacity, his type of operation, its efficiency and any and all other relevant factors that would have a bearing upon and that would influence the amount of profits during the period that profits are recoverable as well as the years used for comparative purposes. *See* Frank Sullivan Company v. Midwest Sheet Metal Works, 335 F.2d 33, 41 (8th Cir. 1964).

Other questions raised in the petitions for rehearing have been considered and rejected as being without merit. The judgment must still be reversed and remanded for a new trial on the issue of damages.

Both petitions for rehearing are denied.