**MULTIVISION NORTHWEST, INC.,**
**Plaintiff,**

v.

**JERROLD ELECTRONICS CORPO-**
**RATION, Defendant.**

**Civ. A. No. 14191.**

United States District Court,
N. D. Georgia,
Atlanta Division.

July 28, 1972.

---

Warren N. Coppedge, Jr., Mitchell, Mitchell, Coppedge & Boyett, Dalton, Ga., for plaintiff.

J. D. Fleming, Jr., Sutherland, Asbill & Brennan, Atlanta, Ga., for defendant.

SIDNEY O. SMITH, Jr., Chief Judge.

This is a suit in which the plaintiff, Multivision Northwest, Inc. ("Multivision"), a CATV system owner in Dalton, Georgia, seeks to recover damages from the defendant Jerrold Electronics Corporation ("Jerrold"), a prime supplier of electronic components used in the system. Specifically, the plaintiff claims a breach of warranty, both express and implied,[1] arising out of its purchase of certain amplifying equipment, automatic gain controls and power supplies incorporated into the Dalton system. The case was tried non-jury and from the extensive evidence presented, the court makes the following

## FINDINGS OF FACT

Plaintiff Multivision obtained a local franchise for a CATV system in March, 1965, from the government of the city of Dalton, Georgia, and immediately began preparations of its lay-out and construction. At the time, there was already an outstanding stale franchise, previously issued but not acted upon. Additionally, there was public knowledge to the effect that future CATV operators would be restricted to certain non-duplication regulations (whereby the same showings can emanate only from the nearest station) absent a history sufficient to establish "grandfather" rights. Because of these two factors, there was great need to rush into production and show a marketed product as soon as possible.

Some of the investors in Multivision had previous CATV managerial experience; though not technical. Unlike many new systems which contract the entire construction to manufacturers or to third party independent companies (each of which charges 15% or 20% profit for such services), Multivision determined to build its own system, purchasing its own materials and components but using a labor contractor for heavy construction of the main and feeder lines and its own personnel for installation of the electronic system. The source of technical advice in these early stages is not clear, but it is apparent that everything was done on a "rush" basis. Actual construction by the contractor commenced in June, 1965, and a tower, in essence of telephone poles, was completed in July, 1965.

---

1. Plaintiff also denotes a part of its claims as misrepresentation and fraud. In the court's view the cases have sometimes mislabeled what is really an express warranty or a warranty for a particular purpose as some sort of implied warranty or a misrepresentation amounting to fraud. E. g. Lester v. Superior Motor Car, 73 App.D.C. 171, 117 F.2d 780 (1941); George M. Couch, Inc. v. James, 96 Ga. App. 434, 100 S.E.2d 463 (1957).

Amongst the early purchases by Multivision were original orders from Jerrold, a recognized leader in the manufacture of system components for CATV systems. Insofar as the present controversy is concerned, these original purchases consisted of 16 TAGC's, 40 TBA–1's, 12 TBA–2's, 60 TML–1's, and 26 RPS–30's. All were shipped between July 1st and August 9th during 1965 and virtually all were placed into the early construction.

Essentially, a CATV operation, consists of three main parts: the "head-end" system, the "mixing" system, and the "distribution" system. The "head end" system embraces the antenna sites where each channel is received on its own antenna and fed into down leads or coaxial cable and individually tuned for the best picture. The "mixing" system consists of combining the several channel signals and placing all of them into one cable by having each on a different frequency. The "distribution" system, of course, is the transmission of these signals simultaneously to individual customers. Typically, the distribution system is laid out like a highway or street plan, with a trunk or main line to which feeder or side lines are connected which in turn support the individual drops or taps to each customer. The proper operation of each part is essential to a good end-product because of the cascading of the signal from beginning to end. It is impossible to have a better signal down the line from the one present at any point upstream.

The purpose of an amplifier is to boost the signal periodically in order to maintain the level of the signal which will weaken for practical purposes over approximately 1,400 feet of cable. Basically, it is indiscriminate in its function, boosting bad effects or "noise," i.e., "snow," "cross-hatch," "ghosts," "bars," etc., along with the signal proper and also producing "noise" itself. Accordingly, each amplifier has internal controls which are adjusted to boost the prime signal over its own noise and other devices to block out or filter the undesirable noise. Of prime use in this connection are sophisticated transistors or "capacitors" which perform the filtering action, siphoning off or grounding the noise, but permitting the prime signal to pass down stream on the line. If the capacitors fail to function properly, the resultant noise generated by the amplifier will be fed into the signal and transmitted downstream from each station to the end. The practical limitation of an amplifying system is some 32 amplifiers in any combination from the "head-end" to the end of any line.

The TML–1 is a main or trunk line amplifier; the TBA–1 is a regular bridging amplifier used alongside a TML–1 at the beginning of a feeder-line, which together with a 24-volt AC power unit, the RPS–30, constitute a "station." The TBA–2 is an intermediate bridging amplifier installed at some point other than a TML–1 station (less than 1400 feet) to commence a feeder line. The TAGC is used as a slope control apparatus to balance the signal with either. With the exception of the RPS–30 power unit,[2] all of these products incorporate capacitors which perform essentially the same function in each unit.

On or around September 2, 1965, defendant Jerrold began receiving reports from the field of capacitor failures in its T-line series of amplifying equipment. The capacitor was subsequently identified as Jerrold Part No. 127–065 and it was determined that the manufacturer of the capacitors (Aerovox) had experienced a "bad run" of approximately one-third of those capacitors produced during the early part of the summer of 1965. Since Jerrold had no way of knowing at that time how many capacitors might be involved or how many of its previously shipped amplifiers and

2. At the commencement of this suit, the plaintiff advanced a claim to the effect that the RPS–30 did not perform up to specifications. However, no evidence was produced to this effect and it is undisputed that the RPS–30 does not use capacitors of the type in question.

gain controls might have been equipped with the suspect capacitors, Jerrold issued an internal quality hold on September 9, 1965, on all TBA–1, TBA–2, and TML–1 amplifiers and also on TAGC–213 automatic gain controls, all of which were using capacitor 127–065. The quality hold was followed on September 13, 1965, by Jerrold Deviation No. 0117, terminating the use of 127–065 capacitors in the T-line amplifying and gain control equipment and specifying the replacement of the 127–065 capacitor with Jerrold Part No. 127–042. The quality hold and deviation together were sufficient to terminate any further use of the suspected capacitors. It is improbable that any substantial amount of equipment would have been shipped with 127–065 capacitors following the deviation.

At that time, Jerrold also began to replace capacitors in its current stock of amplifying and gain control equipment. In addition, Jerrold prepared Service Bulletin No. 50 to be distributed to Jerrold customers for the purpose of alerting them as to the possible capacitor problem and recommending the capacitor change reflected in Deviation No. 0117. Subsequently, the formal engineering change, superseding Deviation No. 0117, issued on November 14, 1966. The suspect capacitor, 127–065, was a small yellow plastic capacitor. Its replacement part, 127–042, is metal and comes in a small and large size and was substantially used by Jerrold from 1966–1971.

Meanwhile, in August, 1965, Multivision had employed a competent engineer, Emerson, from California, to report to Dalton and "take charge" of the situation which was apparently proceeding without direction. When he arrived, Emerson in effect became the general manager with responsibilities in all phases of the operation—office, sales and promotions, construction, training, and technical performance. As such, he was extremely busy endeavoring to produce a saleable picture as quickly as possible, upgrade the existing system's performance, supervise the new line instal-

lation and customer service lines and work on sales and public relations. In fact, all functions except finance, which was managed by Fryman for Multivision out of Ohio, fell to him.

Shortly after his arrival the initial segment of the system, consisting of 16.-2 miles of cable and 99 subscribers, was placed into operation. At best, it performed poorly. Along with the myriad other duties, Emerson undertook to isolate the causes of such poor performance. Specifically, Emerson found that the head-end and main antenna tower were in an undesirable location, that the arrays and configurations on the master antenna had been improperly located and aligned and that there were numerous head-end reception problems, resulting both from construction deficiencies in the head-end itself and from off-cable interference. Emerson also found that the amplifiers on the existing system had been improperly spaced and located and that the feeder lines carrying signals to individual subscriber locations were "too long" (i. e. that amplification of signals along the feeder line was insufficient). Emerson made numerous changes in the head-end equipment and also began to realign and rebalance the system, although there were no system maps available to assist him in this job. Emerson also experienced some problems with "noisy" amplifiers but did not consider this to be a serious difficulty compared to the numerous other problems existing on the system. Emerson testified that there was no way to determine the extent to which the amplifiers may have been contributing to system problems when compared to the other difficulties being experienced on the system at that time.

Simultaneously, Emerson was pushing construction and installation of the new lines and searching for a new antenna site. By December, a new site had been acquired and the lines extended to 51.8 miles. In early November, Emerson was orally informed by Jerrold representatives that Jerrold had received a bad run of capacitors during the summer

months. Jerrold offered to assist in solving the potential problem by (1) sending its engineers to Dalton to replace the suspected capacitors in the Multivision equipment, (2) replacing amplifiers in any Multivision equipment returned to the Jerrold plant, or (3) sending replacement capacitors to Dalton to be installed by Multivision personnel. Emerson rejected Jerrold's offer to send engineering personnel to Dalton and instead requested that replacement capacitors be shipped to Dalton to be installed by Multivision technicians since he and his crews were already in the process of realigning, balancing and expanding the system at that time. Replacement capacitors (127–042) were then shipped by Jerrold to Multivision from time to time during November, 1965, to January, 1966, in sufficient numbers to change out all suspected capacitors in the Multivision equipment. Emerson also received Jerrold Service Bulletin No. 50 with or shortly after the first shipment of replacement capacitors and he placed this bulletin in the Multivision engineering files.

At the time of the original notification, Emerson had stock-piled a number of amplifiers and TAGC's. In his efforts to correct existing performance and in the continuing new construction, he simply drew from inventory as needed. If a line test showed a bad picture at an amplifier station, the unit was removed and a new one installed. Also, as new construction called for a unit, it was drawn from inventory, either new or used. At the same time, the second orders from Jerrold began to be filled. They consisted of 12 TAGC's, 47 TBA–1's, 9 TBA–2's, and 33 TML–1's shipped between November 8, 1965, and January 26, 1966. These new orders were simply placed into stock with the old, both new and used.

Emerson considered the capacitor problem of little consequence and minimal in his overall problems at the time. Accordingly, instead of making a systematic replacement throughout the system and stock, he simply replaced the capacitors on a unit as it was put into service, either as a replacement or in new construction. However, it is virtually certain that all capacitors had been replaced in this fashion by the end of February, 1966. On February 23, 1966, he requested credit from Jerrold for such remedial work. Simultaneously, he set aside a few units which he felt to be malfunctioning which were returned to Jerrold and replaced with new ones.

In early 1966, the antenna and complete head-end system was moved to a new permanent site, and Emerson set about anew on his two main responsibilities of performance on the old and new lines. He experienced difficulties typical to a new CATV operation. His technical help was poorly trained, cash flow and morale were a problem, and sales were still lagging. In the spring of 1966, he continued to work on the many problems and received new technical help and sales help. Periodically, he would tinker with the balance of individual stations, the head-end, and drop problems. However, the system was never completely balanced in its entirety, but he considered it in fair shape mechanically and technically by the summer of 1966, when things in general began to settle down.

Concurrently, he suffered some personal problems completely unconnected with his employment or this case, which dictated his resignation in early July, 1966. At the time, he recommended a "sweep" of the entire system, insuring that it was all in balance. While its technical aspects are beyond comprehension to the unknowledgeable, "balance" consists primarily in insuring that the input channel signals on the different frequencies remain proportionate in the output after the amplifying boost. A failure to maintain this balance of the same signal and in relation to companion signals can produce serious deteriorating effects further down the line.

From the summer of 1966 to March, 1967, the system continued to founder. Emerson's technical replacement was not

as competent as he and patchwork remedial action was the rule rather than the exception for the difficulties experienced. In these processes, the Multivision technician suspected that he had some amplifier trouble so he constantly exchanged new amplifiers for those on line with no appreciable differences. However, 100 feet was added to the tower with improvement of the "head-end" picture. Again there was no systematic complete "sweep" of the system. Sales continued to lag and there was poor acceptance of the picture product because of its less-than-average quality. In this respect, Multivision was at a market disadvantage in that many parts of Dalton could receive good pictures off the cable from all major networks from their nearby Chattanooga affiliates. In other words, it took a better-than-average picture to produce mass sales in the Dalton market.

The initial capital investment in CATV is huge. In direct and indirect capital costs, this system has in excess of $850,000.00 now invested. In theory, the idea is to recoup the investment in the early years and reap large profits thereafter for an indefinite period. A low overhead after the initial construction and promotion makes this economically possible. Accordingly, the more quickly income can be generated the more savings can be effected and the pay out period shortened. In this context, the financial picture in 1966 and early 1967 was not satisfactory. Only some 966 customers had been sold by June, 1967, and the income for the fiscal year ending October 31, 1966, was only $33,597.29, and expense was $241,015.00 creating a large deficit which had to be capitalized. By way of further example, in the fiscal year ending October 31, 1967, income amounted to some $62,401.-34 against a real expense of $206,108.40. Meanwhile, by January, 1967, the line had been extended to 84.36 miles. All of

these factors created a real crisis for Multivision. During the winter of 1966–67, they repeatedly asked for technical help from Jerrold and secured the visitation of its consultant, Dourdoufis, in March of 1967. A few weeks later, Multivision also secured the services of a professional CATV "trouble-shooter" in the person of Reeve.

Reeve himself had had considerable prior CATV experience, including the design and installation of equipment and new system responsibility in Hawaii and Ohio. In all respects he is an able knowledgeable technical expert in the field. His original employment provided for a two or three day survey and, if he thought he could help, a one year contract. He stayed for two years. Upon his arrival, he felt that the "head end" pictures were satisfactory but that the line picture was still of poor quality.

Immediately prior to his arrival and shortly after, Dourdoufis had installed some traps at the head-end; had removed a channel mixer and changed some improper grounds and nonrecommended cable. He also had reinstalled some TAGC's and thermatics which had been removed by Multivision in an effort to isolate the problem and readjusted some controls in some amplifiers. A number of front-end amplifiers were also exchanged.

In his experience, Reeve had worked extensively with Jerrold equipment and had heard in the past of the bad capacitors encountered in 1965. Not knowing whether any preventive action had been taken at Dalton, he recommended the replacement of all capacitors as part of his corrective procedure. More importantly, he set about upon a systematic complete balancing of the system at a reduced DB rate. The "DB" is the ratio of input to output at an amplifying station. Primarily, the system had been set on a 24DB rate throughout, but this was changed to a 22DB rate.[3] The entire

3. Collaterally, the plaintiff contends that this factor may constitute a breach of warranty inasmuch as the specifications state that the Jerrold equipment will

operate at 24DB. According to the testimony, an amplifier does "just as much work" at the lower setting. Moreover, a change of 3DB's is necessary to be ob-

process consumed some three months—April, May and June of 1967.

In it, each unit of the 150–200 total in the system was removed one at a time. In the balancing process, each unit was given the customary bench test and re-aligned. In the bench test with Jerrold testing equipment, a defective capacitor of the type in question is not revealed. Accordingly, in the abundance of caution, all small capacitors were replaced with large ones. It is not satisfactorily shown whether the small capacitors were the plastic yellow, 127–065 or the metal 127–042, but the physically dissimilar large 127–042's were inserted and marked throughout. The amplifiers were reset at 22DB, all settings adjusted, and the unit replaced into the line, being respaced if necessary. In this operation, Reeve also utilized the technique of viewing an actual signal as well as a test signal on each unit before replacement.

Upon completion of this lengthy process the end picture was materially improved. Since June, 1967, the system has operated with no difficulties other than an occasional capacitor failure due to extreme temperatures, particularly cold. Capacitors themselves have an average life of only two years and the temperature problem appears commonplace. As part of his regular maintenance, Multivision's current manager, Bowman, performs weekly checks on the "balance" and completely sweeps the system three time a year.

In all of these procedures, it is not shown whether any bad capacitors were actually incorporated into the units originally furnished by Jerrold to Multivision. Nor, is it shown that any capacitor replaced in the original change-over by Emerson in 1965–66 was actually defective or that any capacitor replaced by

Reeve in 1967 was actually defective. At neither time was any complaint registered to Jerrold in this regard. All replacements were done as a matter of precaution and incidental to the balancing and alignment process. No witness can testify positively that the capacitors caused any of the plaintiff's transmission difficulties.

In that regard, a defective capacitor will produce a reception phenomenon known as "cross hatching," which consists of wavy vertical or diagnonal lines appearing at various locations on the television screen. The same problem can occur from improper spacing or faulty slope-control. According to the technical witnesses, a defective capacitor will not result in "snow" or "cross modulation," or "ghosts" nor should a failing capacitor result in audio difficulties or color confetti, although there may be some degradation of signal and a loss of color associated with improperly operating capacitors. Under no circumstances would a failing or defective capacitor result in a total loss of signal or a complete "blackout" on the system. The most common reception problems cited by the Multivision subscribers during the period of November, 1965—June, 1967, were snow, audio problems and complete interruptions of reception. Furthermore, a survey of the inactive subscriber files kept and maintained by Multivision (which files show those persons who terminated cable service and never resubscribed), indicates that relatively few people cancelled their CATV subscriptions in Dalton for reasons of poor reception or other dissatisfaction with plaintiff's CATV service, as opposed to those cancelling for moving or being terminated for non-payment.

■ There is no question that plaintiff suffered considerable financial loss-

---

served by the naked eye. The change does make the system as a whole easier to balance and apparently operate more efficiently. Derating does require the installation of a few more stations as the boost is diminished in terms of distance. Four of five were added by Reeve. The

technical witnesses on both sides negate any malfunction in this respect and any appreciable contact with plaintiff's problem. From a legal point of view, there is no proof of breach of warranty in this regard.

es in the 18 month period from January, 1966, to July, 1967. Immediately thereafter revenues increased and the business has operated smoothly since. However, there is insufficient proof to conclude that any breach of warranty occurred by virtue of the equipment in question or that any defect in the equipment caused the losses claimed.

At the conclusion of the dealings between the parties, the plaintiff was indebted to defendant in the sum of $17,863.21 after deduction of all credits.

## CONCLUSIONS

■ There is little question that plaintiff received a warranty from defendant on the goods in question. In context of this case, the presence or absence of an express warranty through the specifications and instructional bulletins is of little consequence; for the court is convinced that the special implied warranty of fitness under Georgia Code § 109A-2-315 is present. That section provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

■ At all times, the defendant knew of the proposed uses of its products. Indeed, as specialty products with a restricted use, they almost carry such a warranty with them. Moreover, the defendant was a recognized expert in the area of CATV systems. Unquestionably, the plaintiff was justified in relying on the seller's skill and judgment, and its "superior knowledge" and the warranty arises by operation of law. As the court understands it, while such a warranty might be limited by an express warranty or disclaimer, it is not broadened thereby as it is already as broad as the law extends absent a spe-

cific guarantee as to results. Under the warranty of fitness, the seller warrants that the goods sold are suitable for the special purpose of the buyer; in this case that the electronic components would function with reasonable reliability in plaintiff's CATV system. E. g. Entron, Inc. v. General Cablevision of Palatka, 435 F.2d 995 (5th Cir. 1970); Texas Motorcoaches, Inc. v. A. C. F. Motors Co., 154 F.2d 91(4) (3rd Cir. 1946).

■ In order to recover in warranty, it is necessary that the plaintiff show (1) that the goods in question were defective upon delivery and (2) that such defect caused the damage claimed. In cases of this type, it is clear that proof of the defective quality of the goods is the prerequisite to recovery. Absent such proof, the case must fail. Holcomb v. Cessna Aircraft Co., 439 F.2d 1150 (5th Cir. 1971); United States Rubber Company v. Bauer, 319 F.2d 463 (8th Cir. 1963).

In this respect, there is no direct evidence as to any defect of the capacitors in question. While it is true that the defendant had a "bad run" of approximately one-third of the capacitors, there is no evidence that any of the one-third, as opposed to the good two-thirds, ended up in the components shipped to Multivision. No witness is able to testify that any capacitor in the hands of plaintiff was bad and no test revealed that any was bad. Thus, in order to prevail, it is necessary for the plaintiff to overcome the almost insurmountable barrier of proving such defect by circumstantial evidence. In such cases, the test is severe. The Georgia test in civil cases is described as follows: " 'When the party upon whom the burden of an issue rests seeks to carry it, not by direct proof, but by inferences, he has not, in this reasonable sense, submitted any evidence for a jury's decision, until the circumstances he places in proof tend in some proximate degree to establish the conclusion he claims; and for this, the facts shown must not only reasonably support that conclusion, but also render less probable all inconsistent conclusions.

. . . [I]t is required that the circumstances relied upon not only be consistent with the conclusion sought to be established, but also inconsistent with every other reasonable hypothesis. In civil cases this consistency with the one and inconsistency with the other is required to be established only by a mere preponderance. . . .' Ga. R. & Elec. Co. v. Harris, 1 Ga.App. 714, 717, 57 S.E. 1076, 1077." Georgia, A. S. & C. R. Co. v. Collins, 117 Ga.App. 254(2), 160 S.E.2d 441 (1968).

While it is possible to prove a defect under this test, it is most often successful when a malfunction can be attributed to a single cause. E. g. Lewis v. Mobil Oil Corp., 438 F.2d 500 (8th Cir. 1971) (Where the machinery had performed satisfactorily with other similar products); Carlson v. Chisholm-Moore Hoist Corp., 281 F.2d 766 (2d Cir. 1960) (Where other causes of the damage were effectively negatived). Here, the plaintiff is at least one step removed in that a poor picture, causing economic damage, is used as a basis to infer a malfunction of the components to infer a defect of this particular part. To conclude that there was actual defect in the capacitors, the court would be required to place an inference upon an inference. See Smith v. General Motors Corporation, 227 F.2d 210 (5th Cir. 1955) for an illustration of this difficult form of proof. Nor can such difficulty be overcome by a contrary conclusionary opinion by plaintiff's witnesses. Accordingly, it is concluded that plaintiff's evidence is insufficient as a matter of law to prove the existence of any defect.

▐ Moreover, in a factual context, the court must find against such a result. The plaintiff's basic position is that the system was not operating properly; that the capacitors were replaced; that the system began to operate satisfactorily; and that, therefore, the capacitors must have been the cause of the trouble. This theory was euphemistically referred to as "res ipsa loquitur" during trial. However, the evidence reveals that the bad capacitors, if any were present, were all replaced by late January, 1966, which is the beginning point of plaintiff's damage period. While they were again replaced in the spring of 1967 (almost at the end of their natural life), it is highly unlikely that any original capacitors, bad or good, were present at such time. More importantly, each replacement was accompanied by a myriad of other corrective procedures to the system as a whole as detailed in the findings of fact. Based upon the knowledge acquired at trial, the most important of these was the first and only complete "sweep" of the system occurring in 1967. At no time prior thereto had there been any substantial effort to balance the system from one end to the other. When it was accomplished by Reeve, plaintiff's technical troubles ended. Moreover, a regular preventive program of this type since has maintained the high quality of the picture. The picture difficulties encountered in Dalton were practically all of a type not attributable to the defect claimed but rather to other technical causes. They too cleared up when the entire system was balanced by a competent engineer. On the basis of the evidence produced, the court concludes that the damage claimed [4] was not due to any

4. Even had the finding been otherwise, plaintiff would encounter similar difficulties in proof on the question of damages. As seen, a claimant in warranty must not only prove the defect, but also must show that the defect caused the loss. In its continuing duty to mitigate damages, plaintiff would be required to exercise ordinary care to prevent loss due to a known defect. Defendant clearly notified plaintiff of the possibility of bad capacitors in November of 1965. Instead of immediately undertaking a careful replacement in every component, Emerson's corrective measures were at best sporadic and haphazard and as the opportunity arose. Without deciding whether any such failure cuts off subsequent damage, the problem of damages and their proof is great. Unquestionably, had there been a

breach of warranty on the part of the defendant.

There remains defendant's counter-claim for the account due of $17,863.21. Defendant is entitled to a recovery thereon unless barred by the four-year statute of limitations prior to its assertion in this case. The court has previously ruled that plaintiff's claim was not barred by the running of the warranty statute between a timely state filing and a subsequent voluntary dismissal and refiling in federal court (see order of December 15, 1971). This counterclaim was brought only in the federal action. Under the special circumstances here, it is agreed that if the counterclaim is one for "recoupment" under Georgia law, it is good; if, however, it is one of "set-off" it is barred by the statute.

In Georgia, recoupment is defined as "a right of the defendant to have a deduction from the amount of plaintiff's damages, for the reasons that the plaintiff has not complied with the cross obligations or independent covenants arising from the same contract." Ga.Code § 20–1311. Generally, recoupment is purely defensive and not offensive, i. e., in the absence of a statute providing otherwise, matter availed of by way of recoupment only goes to reduction or extinguishment of damages and cannot be made the ground for an affirmative judgment in defendant's favor. 80 C.J.S. Set-off and Counterclaim § 61 (1953). This was once the law in Georgia. *See* Lufburrow v. Henderson, 30 Ga. 482, 484 (1859). But, since 1878, recoupment in Georgia has not been limited to a defensive purpose. "In all cas-

defect and breach of warranty as claimed, plaintiff would have been entitled to replacement costs including reasonable labor, or the difference in market value. Ga.Code § 109A–2–714. Thus, upon proper proof, the internal expense of the change-over was recoverable and may be all that is. Taylor v. Wilson, 109 Ga. App. 658, 137 S.E.2d 353 (1964). In terms of plaintiff's claimed damage, these were negligible. Instead, plaintiff sought recovery of lost profits. The court is convinced that lost profits, if supported by proper proof, are recoverable as consequential damages from a breach of warranty. Ga.Code §§ 109A–2–714(1), 109A–2–715. E. g. Lewis v. Mobil Oil Corporation, 438 F.2d 500 (8th Cir. 1971). The problem, of course, is one of proof. The amount of actual loss must be rendered reasonably certain by competent proof. Atlanta Gas Light Co. v. Newman, 88 Ga.App. 252, 76 S.E.2d 536 (1953); United States v. Crawford, 443 F.2d 611 (5th Cir. 1971); Eastern Federal Corp. v. Avco-Embassy Pictures, Inc., 326 F. Supp. 1280 (N.D.Ga.1970). This burden is most often met in those instances where the claimant has a previous profit history. E. g. Lewis v. Mobil Oil Corporation, *supra*; Willred Company v. Westmoreland Metal Mfg. Co., 200 F.Supp. 59 (E.D.Pa.1961). How then does a brand new business show loss of profits? The problem is not easy, though the loss may be real. Here, the plaintiff in a sometimes brilliant presentation, sought to calculate the loss by transposing the business experience of Multivision commencing in

July, 1967, in terms of customers, market saturation, fixed overhead, cash flow losses, return on capital, etc. to January, 1966. This was done in graphic form to illustrate the differences and by the testimony of financial experts. (See for example P Ex. #86). If it could be assumed that the entire loss was caused by a breach of warranty, rather than by personnel, marketing, and management problems or the other technical difficulties encountered (which the court could not do here), such and approach seems sound to determine loss "in any manner which is reasonable" under § 109A–2–714 or "which could not reasonably be prevented" under § 109A–2–715. Such statistical proof has received approval in the anti-trust area. E. g. Elyria-Lorain Broadcasting Co. v. Lorain Journal Co., 298 F.2d 356 (6th Cir. 1961). While the proof offered here is circumstantial in nature, a court or jury could (assuming causation) find that some part of the damage claimed was reasonably certain. Thus, it is conceivable that the loss of one or more of the elements claimed could pass the circumstantial evidence test with such proof. This approach would leave the trier of fact free to return a reasonable finding on lost profits for a new business within the limits of the evidence produced. As past experience is generally considered a sound basis to prove loss of profits, there is no reason to believe that subsequent experience could not also. While it remains a Pyrrhic victory, plaintiff's counsel is to be commended for this innovative approach to a difficult legal question.

es where recoupment may be pleaded, if the damages of the defendant shall exceed in amount those of the plaintiff, the defendant shall recover of the plaintiff the amount of such excess." Ga. Code § 20–1314.

Many courts have held that a defense by way of recoupment is not barred by the statute of limitations as long as the main action is itself timely. *See*, e. g., Bull v. United States, 295 U.S. 247, 262, 55 S.Ct. 695, 79 L.Ed. 1421 (1934); Luckenbach S.S. Co. v. United States, 312 F.2d 545, 549 n. 3 (2nd Cir. 1963); City of Grand Rapids v. McCurdy, 136 F.2d 615, 619 (6th Cir. 1943); Pennsylvania R.R. Co. v. Miller, 124 F.2d 160, 162 (5th Cir. 1942). Georgia's courts have so held. *See*, e. g., Morrow v. Hanson, 9 Ga. 398 (1850) ("So long as the plaintiff has the legal right to sue on the contract, the defendant has the correlative right to defend it."); Swindell & Co. v. Bainbridge State Bank, 3 Ga. App. 364, 371, 60 S.E. 13, 16 (1907) ("As long as the plaintiff has a legal right to sue on the notes, the defendants would have a correlative right to defend; and the plaintiff could not insist upon the statute of limitations in order to avoid the defendants' defense while seeking to enforce the contract against him.") Thus, in a reverse situation to that present here, the plaintiff's claim for breach of warranty would apparently be considered in the nature of a recoupment if defendant had initiated the litigation by a suit on the account. Burton v. Campbell Coal Co., 95 Ga.App. 338, 97 S.E.2d 924 (1957); Empire State Jewelry Co. v. Grant Jewelry Co., 19 Ga.App. 125(2), 91 S.E. 214 (1917).

The law is not so well settled, however, in respect to the use of recoupment to gain an affirmative recovery on a claim which would ordinarily be barred by limitations. According to at least one source, if the amount due defendant exceeds the amount due plaintiff and affirmative action is barred by limitations, defendant cannot recover the excess by way of recoupment. 53 C.J.S. Limitations of Actions § 105 (1954).

Nevertheless, in what seems to be the only Georgia appellate decision on point, affirmative relief was allowed. *See* Roberts v. Roberts, 39 Ga.App. 810, 148 S.E. 606 (1929). Allowing affirmative relief seems correct under the Georgia approach. Georgia Code Section 20–1314 provides that *"In all cases where recoupment may be pleaded,"* if defendant's damages are greater than plaintiff's defendant shall recover the excess. Recoupment may be pleaded regardless of the statute of limitations. Therefore, defendants may recover damages on claims raised as recoupments after the limitations have run. *But see* Blackshear v. Dekle, 120 Ga. 766, 48 S.E. 311 (1904) (indicating that recoupment defense is not barred by limitations, although such time may have elapsed that it would be too late to make counterclaim).

On the basis of the available authority, it appears that Georgia runs counter to the general rule and allows an affirmative recovery on recoupment.

Accordingly, judgment may issue for defendant and against the plaintiff in the sum of $17,863.21 plus costs of suit.

It is so ordered.