## David JONES D/B/A WICKES LUMBER & BUILDING SUPPLY CENTER *v.* Glen ATKINS

5-6242                                           494 S.W. 2d 448

### Opinion delivered May 14, 1973

*Switzer & Switzer,* for appellant.

*Huey & Vittitow,* for appellee.

CONLEY BYRD, Justice. This litigation arises out of some hog paneling manufactured by Balhan Manufacturing Company. The appellee Glen Atkins being desirous of going into the hog business, looked at a number of installations in other states and decided to install what he describes as the "Cargill system." He had learned that he needed a heavy duty Balhan panel 16 ft. in length and 35 inches high and that he could acquire them in Missouri at a cost of $8.75 per panel. When appellee got ready to order his wire panels he talked to Larry Johnson an employee of appellant, David Jones D/B/A Wickes Lumber & Building Supply Center, and told him that he would order the heavy duty panels from him if the price was right. When Johnson asked him what price he was talking about, he told Johnson that he could get the panels in Missouri for $8.75 per panel. Johnson later called back and informed appellee that he could deliver the panels for $8.77 per panel. Appellee ordered 228 panels at that time and paid for the same either upon delivery or shortly thereafter. During the construction, appellee determined that he needed an additional 57 panels and upon calling appellant found that Johnson's employment had been terminated. However, he placed the order

with appellant for the 57 panels. Those panels arrived on April 5, 1970, on a truck loaded with some additional panels. At that time appellee discovered that the wire in the other panels loaded on the truck was of a heavier gauge than what he was receiving. He had installed only a few panels of the first order at that time. Because of his breeding and farrowing schedule appellee used the 57 panels to complete his "Cargill system." Appellee testified that he did not make an earlier complaint after delivery of the second order, because he desperately needed these additional panels to bring his operation up to schedule and it took him some time to see that the wire was unsuitable for his purposes. When appellant refused to make any adjustment, appellee refused to pay for the 57 panels. At the trial appellee testified that because of small difference between the gauge of the wire in the heavy duty panels and the gauge in the light weight panels, it was impossible for him, without a comparison, to determine that the 228 panel shipment did not conform to his heavy duty order. Other testimony on his part showed that Balhan Manufacturing Company regularly retailed the heavy duty panel for $8.75 and the light weight panel for $6.75. The difficulty with the light weight panel arose because the welds broke loose permitting the hogs to go from one pen to another.

Appellant brought this suit to recover the price of the 57 panels. Appellee counterclaimed for damages for the non-conformity between the heavy duty panels he had ordered and the light weight panels he had received. At the close of the evidence appellant moved for a directed verdict under two provisions of the Uniform Commercial Code.—*i.e.* Ark. Stat. Ann. § 85-2-602 and § 85-2-606. Those sections provide:

"85-2-602. Manner and effect of rightful rejection.—
(1) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.
(2) Subject to the provisions of the two [2] following sections on rejected goods (Sections 2-603 and 2-604 [§§ 85-2-603, 85-2-604]),

(a) after rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller; and

(b) if the buyer has before rejection taken physical possession of goods in which he does not have a security interest under the provisions of this Article (Subsection (3) of Section 2-711 [§ 85-2-711]), he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them; but

(c) the buyer has no further obligations with regard to the goods rightfully rejected.

(3) The seller's rights with respect to goods wrongfully rejected are governed by the provisions of this Article on Seller's remedies in general (Section 2-703 [§ 85-2-703]). [Acts 1961, No. 185, § 2-602.]

"85-2-606. What constitutes acceptance of goods.—

(1) Acceptance of goods occurs when the buyer

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2-602 [§ 85-2-602]), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

(2) Acceptance of a part of any commercial unit is acceptance of that entire unit. [Acts 1961, No. 185, § 2-606]"

The trial court ruled that "the facts in this case, in the Court's opinion, don't fit into the statutes that you have quoted, Mr. Switzer" and dismissed both the complaint and counterclaim with prejudice. For reversal appellant contends that the trial court erred in failing to direct a verdict on the basis that the Uniform Commercial

Code did not apply and because appellee's counsel admitted that he was entitled to a directed verdict.

We do not agree with appellant's argument that the trial court refused to apply the Uniform Commercial Code. Rather it appears to us that he only held inapplicable to the facts of this case the two sections upon which appellant relied. As we view this record a fact issue, particularly as to the 228 panels, was made under Ark. Stat. Ann. § 85-2-608 which provides:

"85-2-608. Revocation of acceptance in whole or in part.—(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it.

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them. [Acts 1961, No. 185, § 2-608.]"

In speaking of the rights of a buyer to recover damages for breach in regard to accepted goods, the *American Law Institute* pamphlet on *Sales and Bulk Sales* by *William D. Hawkland,* contains this language:

"We have seen that a buyer's acceptance of the goods (2-606) only necessarily precludes his right to

reject them. In proper cases, he may revoke his acceptance and claim the same rights and duties with regard to the goods involved as if he had rejected them (2-608). Thus, a buyer properly revoking acceptance can 'cover' under section 2-712, recover damages for non-delivery under section 2-713, obtain specific performance in a proper case (2-716), and hold a security interest in the 'rejected' goods for the price paid for them. Section 2-714 deals with the remedies of the buyer after the goods have been accepted and revocation of acceptance is not possible. In such a case, the seller must be given credit for the value to the buyer of the accepted goods, and normally the measure of damages should be the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had conformed to the contract, unless special circumstance show proximate damages of a different amount. Subsection 2-714 (2) expressly lays down this test as the measure of damages for breach of warranty. Subsection 2-714 (1) provides that the buyer 'may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.' The 'non-conformity of tender' referred to in this section includes breach of warranty, but the measure of damages for breach of warranty is specifically set out in subsection 2-714(2) and apparently supersedes the more general test of subsection 2-714(1). Subsection 2-714(3) makes it clear that consequential or incidental damages as provided by section 2-715 can be had in proper cases.

"We have seen that a buyer who has accepted non-conforming goods does not have an absolute defense to the seller's action for the price if the acceptance has barred his right to revoke his acceptance. His redress, assuming he is not completely barred by lack of proper notice or by agreement, is an action or counterclaim for damages or a recoupment from the price. The recoupment remedy is set out in section

2-717. Under this section, a buyer on notifying the seller of his intention so to do may deduct all or any part of the damages resulting from any breach from any part of the price still due. The requirement of notice changes the law of recoupment under the Uniform Sales Act. It is a sensible requirement, for the seller should be apprised of the buyer's intentions in withholding the price. No formality of notice, however, is required by the section, and any language which reasonably indicates the buyer's reason for holding up his payment is sufficient. There would seem to be no reason why the notice of breach required by subsection 2-607(3) to save the buyer's rights after accepting the goods could not include a statement of intention to recoup as required by section 2-717."

In arguing his case to the trial court sitting as a fact finder, appellee's counsel stated:

"If it please the Court, we can't figure out how you can reject it after they had been installed, and we submit that Mr. Atkins relied upon Wickes that he was receiving the heavy duty wire, and acting upon that, he installed it. He had the pigs coming in, and, after some use, and completed the cycle to where his pens were all full where they were pushing up on either side of the posts, the wire didn't hold up, I suggest, is not trying to have his cake and eat it too. After spending some five or six thousand dollars with Wickes and not trying to beat people out of a five hundred bill, he found out that he had been sold the lighter wire at the heavy duty price, and that is what this lawsuit is about. Certainly he was upset about it. He made a personal trip down there to tell them about it. Now, he did not say that I am bringing these wire panels back to you. They had already been installed and were welded to posts. This is an impossible situation. He did receive it, and he is still trying to use it. He has accepted it, and I am satisfied that he owes this five hundred and nineteen dollars for it even though he got something that he didn't order. But I am saying that we are entitled to a set-off on this case. He has been damaged twelve

hundred and fifty two dollars. It has cost him that much money to accept it and to use it, and he hopes that it will continue to hold up. But, he has had to reinforce it, re-weld it and if he had to pay for that wire under what he ordered it for, he should certainly be reimbursed for what he had to spend to get the use out of it."

Of course the acceptance of the 57 panels does not in itself bar appellees right to counterclaim for the damages for the non-conformity of the 228 panels. As pointed out in the article by Mr. Hawkland, above, it does not in itself bar a counterclaim for damages because of the non-conformity of the 57 panels. Thus for either reason the trial court did not err in failing to direct a verdict for appellant.

Affirmed.