366 F.Supp. 278 (1973)
CHEMCO INDUSTRIAL APPLICATORS CO., Plaintiff,
v.
E. I. du PONT de NEMOURS AND COMPANY, Defendant.
GRADY-GOULD WATERSHED IMPROVEMENT DISTRICT, Plaintiff,
v.
The AETNA CASUALTY & SURETY COMPANY, Defendant and Third Party Plaintiff,
and
E. I. du Pont de Nemours and Company, Third Party Defendant.
Nos. S72 C 15 and S72 C 27.
United States District Court, E. D. Missouri, Southeastern Division.
October 15, 1973.
*279 *280 *281 Ward & Reeves, Caruthersville, Mo., Manuel Drumm, Sikeston, Mo., for plaintiffs.
Limbaugh, Limbaugh & Russell, Cape Girardeau, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
These two actions resulted from the failure of Hyvar-X, a chemical weed eradicant, to kill vegetation on the banks of an Arkansas irrigation and drainage ditch system. These suits are brought under the Uniform Commercial Code as enacted in Arkansas, Title 85 of the Arkansas Statutes.
Civil Action No. S 72 C 15 was originally commenced in the Circuit Court of Pemiscot County, Missouri, and was removed to this Court on the basis of diversity of citizenship and the amount in controversy. 28 U.S.C. § 1332. By this action the chemical applicator, Chemco Industrial Applicators Company ("Chemco"), sued the manufacturer of Hyvar-X, E. I. du Pont de Nemours and Company ("duPont"), alleging a breach of express and implied warranties that Hyvar-X would completely eradicate brush and vegetation. By its answer du Pont admitted that it manufactured Hyvar-X, that it sold the chemical to Sanders Chemical Company, of Cleveland, Mississippi, that plaintiff purchased the chemical from this chemical company, but that any failure to obtain the proper results was due to Chemco's failure to properly apply the chemical. Du Pont interpleaded the Aetna Casualty and Surety Company ("Aetna") to allay possible double liability because Aetna had filed a third party claim against du Pont in Civil Action No. S 72 C 27 arising from the same circumstances.
Civil Action No. S 72 C 27 was originally commenced in the Circuit Court of Lincoln County, Arkansas, was removed to the United States District Court for the Eastern District of Arkansas, and was transferred here. Therein the Grady-Gould Watershed Improvement District ("Grady-Gould") sued Aetna as surety on Chemco's performance bond for Chemco's failure to sufficiently eradicate vegetation from the Grady-Gould drainage ditch banks. Before transferring the case, the Arkansas federal district court remanded the primary claim of Grady-Gould against Aetna to the Arkansas state courts. Only the third party complaint of Aetna against du Pont was transferred here. Aetna claims that du Pont breached its implied and express warranty that Hyvar-X would completely kill brush and trees on the ditch banks.
The Arkansas state court suit resulted in a judgment against Aetna in favor of Grady-Gould for
$24,500.00 with interest thereon from March 16, 1972, at 6% per annum, together with 12% damages thereon and reasonable attorneys' fee in the sum of $3,500.00, aggregating the sum of $30,940.00 which shall bear interest at 6% per annum from this date [March 17, 1972] until paid; together with all of plaintiff's costs herein expended.
Aetna discharged this judgment by payment of $31,388.20. Upon suit in this Court in Civil Action No. S 72 C 29, Aetna recovered a judgment against Chemco and Quentin Still in the amount of $31,388.20 plus attorney's fees of $2,000.00 and costs. See, memorandum *282 filed August 14, 1973, in Civil Action No. S 72 C 29.
This Court tried the Chemco and Aetna claims against du Pont together, without a jury.
Chemco is a Missouri corporation with its principal place of business in Missouri. Aetna is a Connecticut corporation. Du Pont is a Delaware corporation. Subject matter jurisdiction is not disputed and the Court finds that it exists by reason of diversity of citizenship and the amount in controversy. 28 U.S.C. § 1332.
The major issues to be resolved herein are three. First, what, if any, was du Pont's warranty to Chemco regarding the sale of Hyvar-X? Second, did du Pont breach that warranty? Third, if there was such a breach, for what damages is du Pont liable?
To determine the applicable substantive law in these diversity actions, this Court must look to the choice of law rules of the Missouri state courts. Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The evidence shows and the Court finds that Chemco purchased the Hyvar-X from the Cleveland Chemical Company (also referred to during the trial, as the Sanders Chemical Company) of Cleveland, Mississippi. However, the sales were made specifically for use on the Chemco-Grady-Gould eradication project in Arkansas. The chemical was delivered to a location near the Arkansas work site. No other state has weightier contacts with the Hyvar-X sales than Arkansas. The Court believes that under the Missouri rules the applicable substantive law is that of Arkansas. Liebing v. Mutual Life Insurance Co. of New York, 276 Mo. 118, 207 S.W. 230 (1918); Binkley Company v. Teledyne Mid-America Corporation, 333 F.Supp. 1183 (E.D.Mo.1971), aff'd 460 F.2d 276 (8th Cir. 1972).
Chemco was organized in the early part of 1970 as a business enterprise for the eradication of vegetation from the banks of rural watershed and irrigation drainage ditches. Those primarily interested in Chemco were Quentin Still, Jerome Franklin, and Larry DePriest.
DePriest had been in the chemical application business since 1962 and had three years of college education in the field of agriculture. In 1970 he became self-employed as an agricultural chemical applicator.
In June 1965 DePriest helped Jerome Franklin obtain a position with du Pont. Until this employment ended in September 1972, Franklin worked as an agricultural chemist, a chemical salesman and a herb specialist. In its answer to an interrogatory propounded by Chemco, du Pont described Franklin's employment with it during 1970 as that of a territory sales representative responsible for planning and initiating the sales of chemicals, representing his department in all chemical sales contracts with existing or prospective customers, informing du Pont of the results of sales, and recommending courses of action that will most probably increase sales. In 1970 his territory included Mississippi, Southeast Missouri, Northern Arkansas, and Western Tennessee.
Franklin had been a friend of DePriest since their youth. While he was with du Pont, Franklin occasionally worked with chemical applicators, promoting du Pont products and helping them with technical problems. He worked with DePriest in this fashion and found him to be a knowledgeable applicator.
Sometime in December 1969, or January 1970, DePriest told Franklin that his application business was failing. Franklin suggested an application enterprise that specialized in eradicating vegetation from drainage ditch banks and suggested du Pont's Hyvar-X as the chemical to use.
Franklin indicated that he did not wish to become directly involved in the enterprise while he was with du Pont and that in the Fall of 1970 he planned to quit du Pont and enter law school. *283 Nonetheless the plans for the enterprise advanced. Because both realized the need for capital, DePriest approached Quentin Still of Steel, Missouri in early 1970.
Still had been in the cotton gin business since World War II. When DePriest first contacted him about the proposed application enterprise, Still had had no experience applying or selling herbicides. After this first contact, Still met with both DePriest and Franklin several times. During these meetings Franklin stated that he was acting as a representative of du Pont and suggested the use of Hyvar-X because of its tested results.
Still agreed to participate in the enterprise. There was no written memorandum of their agreement, but the evidence shows they agreed that Still would provide necessary capital and secure the necessary performance bonds, that DePriest would contribute his equipment and actually perform or oversee the work, and that Franklin would provide the leads to customers. The three agreed to share the profits of the business one-third each and to allow DePriest a monthly salary in addition to his share in profits. At Still's suggestion the business was incorporated with Still the sole incorporator, shareholder and officer of the corporation. No corporate meetings were ever held and no corporate records were kept.
Franklin intended to promote Chemco's business and the use of du Pont's Hyvar-X when he appeared before drainage district boards for du Pont. He further intended that the Hyvar-X that Chemco used should be purchased from Cleveland Chemical Company because at a previous time this company had given him employment. Furthermore, when Franklin visited potential customers, Wallace Rush, employed by Cleveland, would often accompany him.
While Franklin, DePriest and Still were organizing the business, DePriest told Franklin that money was needed to pay premiums for necessary insurance and to relieve encumbrances on the machinery that Chemco was to use. For these purposes, Franklin gave Still $1,600.00.
From the beginning of the Chemco enterprise Franklin suggested the use of Hyvar-X. He told DePriest and Still that it been tested and proven to be 90 to 100% effective on willow and brush in drainage ditches. Franklin showed them photographic slides that were provided by du Pont which demonstrated Hyvar-X's effectiveness. Franklin also told them that Chemco could safely guarantee an 85% kill, since Hyvar-X would effect a 90-100% kill. Still and DePriest relied upon Franklin's representations regarding Hyvar-X and agreed to use this chemical.
When Franklin made these representations to DePriest and Still, he did so as an agent of du Pont. The applicable rule regarding a salesman's authority to bind his principal to warranties is that his authority "includes the authority to warrant the title, quality, or condition of the thing sold if, and only if, such warranty is usual or customary in such a transaction and is reasonably necessary to transact the business of making the sale which has been entrusted to the agent." 3 Am.Jur.2d Agency, p. 509, § 111. See also, Hercules Powder Co. v. Rich, 3 F.2d 12 (8th Cir. 1924), cert. den., 268 U.S. 692, 45 S.Ct. 511, 69 L.Ed. 1160 (1924); and see, Start v. Shell Oil Company, 202 Or. 99, 273 P.2d 225 (1954), rev'ing, 202 Or. 99, 260 P.2d 468 (1953). The representations by Franklin that Hyvar-X had been proven to be 90 to 100% effective on willow and brush in drainage ditches and that Hyvar-X would effect such a kill for Chemco on drainage ditches were representations within Franklin's authority to bind du Pont. The evidence showed that Franklin had made a similar representation to another chemical applicator, David Cline, prior to the Chemco discussion. This warranty of a 90 to 100% kill with Hyvar-X on drainage ditches became part of "the basis of the bargain" with respect to the sale of Hyvar-X to Chemco and created an express *284 warranty to that effect. 7 C Ark. Stats.Annot. § 85-2-313(1)(a).[1]
Implied in these sales was the warranty of merchantability, i. e. that Hyvar-X was fit for the ordinary purposes for which such a chemical is used. 7 C Ark.Stats.Annot. § 85-2-314(2)(c).[2]
Furthermore, since Franklin knew that Chemco would use Hyvar-X on drainage ditches in the Mississippi River Delta area and that Still and DePriest relied upon his judgment and skill, there arose an implied warranty that Hyvar-X would be fit for that purpose. § 85-2-315.
Chemco executed only one brush control contractthat with Grady-Gould. This contract was executed on June 29, 1970, by Quentin Still as Chemco's president and by Joe C. Hardin as Chairman of Grady-Gould. By this contract Chemco agreed to treat thirty-five miles of ditches in 1970 for $24,500.00. Chemco further guaranteed that its brush control program would obtain an eighty-five per cent kill of existing tree growth in the treated areas. The determination of whether such a kill was achieved was to be made by a committee selected by both Grady-Gould and Chemco.
The Grady-Gould ditch banks that were to be treated varied in width from 8 to 40 feet, covered an area of approximately 140 acres, and contained a mixture of willow trees, oak, bitter pecan, annual weeds and other vegetation. When Chemco began the eradication work in early July 1970, the ditches were nearly dry.
To perform the Grady-Gould contract Chemco used 1213 pounds of Hyvar-X which it purchased from Cleveland Chemical Company at different times between June and September 1970. The work was performed between July 8 and September 19, 1970.
DePriest directed the Grady-Gould eradication work. His equipment included a sprayer mounted on a surplus U. S. Army truck, a three hundred gallon tank with a belt driven paddle agitator, another truck, a new spray nozzle, and two hundred and fifty feet of hose.
The Chemco personnel that worked on the Grady-Gould project included DePriest who supervised the work, visiting the work sites regularly but not remaining on a permanent basis; Ben Shanks who had worked for DePriest previously and who now worked as crew foreman; and two laborers. DePriest instructed the others as to the proper application procedures, telling them to apply the chemical to the root area of the vegetation.
The chemical was delivered in 50-pound cardboard drums and stored in a nearby warehouse. Shanks kept one label for reference and discarded the others with the empty drums.
DePriest testified that initially twice the amount of chemical required by the Hyvar-X labels was used. Later this ratio was reduced to one and a half times the label rate. The crew put down an average of more than sixteen pounds of Hyvar-X per acre. DePriest testified that Franklin had said that eight pounds per acre would have sufficed. DePriest further testified that he was present on the work site approximately 70% of the time the crew worked and that a ground application of the chemical was made *285 since the label required such an application and since the chemical worked through absorption into the roots, not by application to the foliage.
Ben Shanks testified that not all of the ditch banks needed to be sprayed and not all areas were sprayed. The crew operated by driving the sprayer truck along the top of the ditch banks as they sprayed. He testified that there was never any trouble gaining access to an area to be sprayed and that the chemical was applied to each tree.
During the course of the trial plaintiffs introduced as evidence the label supplied by du Pont in answer to plaintiffs' pre-trial interrogatory No. 4. The interrogatory and du Pont's answer are as follows:
4. Are the containers for Hy-Var X labeled? If so, will you please describe in detail the label or in lieu thereof, please attach a copy of such label to your answer to this interrogatory?
Answer 4. Yes. A copy of the label used and a copy of the supplemental labeling is attached hereto. Color appears in the original label which has not been reproduced on the attached copies. The original of this label is available for inspection in the offices of the local attorneys for du Pont . . . .
This label allowed for both broadcast application, using 7 to 12 pounds of chemical per acre, and basal (spot) application. This label also contained a disclaimer of implied or express warranties not included on that label. This disclaimer was printed in the same small size type as was virtually all the other printed copy on the label. It was, therefore, ineffective as a disclaimer of Franklin's warranty of 90-100% effectiveness. See, DeLamar Motor Company v. White, 249 Ark. 708, 460 S.W.2d 802 (1970); Mack Trucks of Arkansas v. Jet Asphalt & Rock Company, 246 Ark. 101, 437 S.W.2d 459 (1969).
Furthermore, the evidence shows that the label supplied by du Pont in answer to interrogatory No. 4 was not used by du Pont on its products until September 1970, long after the Chemco decision to use Hyvar-X and after the sales of Hyvar-X from the distributor had begun. This label, thus, was not part of the basis for the bargain as were Franklin's representations. Elanco Products Company v. Akin-Tunnell, 474 S.W.2d 789, 792 (Tex.Civ.App.1971). On this basis du Pont objected at trial to the introduction of the label into evidence. Plaintiffs argued that this label had been admitted by du Pont as the label on the containers purchased by Chemco by reason of the answer to interrogatory No. 4. While plaintiffs' interrogatory did not specifically require that du Pont submit a copy of the label which was on the containers that Chemco purchased initially, du Pont's answer that "a copy of the label used . . . is attached hereto (emphasis added)" sufficiently and reasonably indicated that such was the intended answer and the Court so construes the answer. Du Pont has supplied the Court, post-trial, with what it represents to be a photocopy of the label on its Hyvar-X containers prior to September 1970. The Court rejects these exhibits as evidence herein for the reasons that said labeling should have been produced prior to trial and that the proffered exhibits are not complete. From their own language it appears that portions of them have been deleted.
The focus of conflict regarding these labels was the method used by Chemco to apply the chemical to the banks. The evidence shows that the Chemco workmen generally utilized the broadcast method of application, occasionally directing the spray to individual trees. The Court finds that this method of application was reasonable and proper in light of Franklin's representations. Du Pont asserts that the chemical application was uneven and that this caused the poor kill. The Court finds the evidence insufficient to support this assertion.
*286 Grady-Gould paid Chemco $24,500.00 in periodic progress payments for the work.
During the Summer of 1971 Grady-Gould personnel complained to Still that the vegetation was beginning to bud again. Still sent Ben Shanks to Arkansas to participate in the inspection provided for by the contract. This inspection committee reported that the extent of kill varied from 20% to 75% at different places along the ditch bank system. From the testimony adduced, the Court finds that the Hyvar-X application did not result in an 85% kill.
Du Pont's expert Hernandez testified, and the Court finds from the evidence, that if 15 pounds of Hyvar-X had been applied per acre by the broadcast method (and the Court so finds), then the Hyvar-X sold to Chemco was not suitable for the job because of the poor results received. The low kill was caused by the unsuitability of the Hyvar-X sold by du Pont for the Grady-Gould project, a breach of the implied warranty of fitness for the use intended for the chemical.
After he received the Grady-Gould complaint, Still notified Franklin who had been transferred by du Pont to Texas. Franklin indicated that he did not care to become involved in the problem. Still also notified Mr. Sanders of the Cleveland Chemical Company who in turn notified du Pont. Du Pont sent Keith Throckmorton to visit Still in Missouri. They discussed the possible reasons why the desired kill was not achieved. Throckmorton stated that du Pont would not make restitution and, when Still indicated that he would respray the ditches, Throckmorton said that du Pont would not furnish the necessary chemical.
Section 85-2-607(3)(a) provides that "[w]here a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . .." When Still notified du Pont through Sanders and Throckmorton of the Grady-Gould complaint, he complied with this notice requirement. See, Comment to § 85-2-607, para. 4; and see, Boeing Airplane Company v. O'Malley, 329 F.2d 585 (8th Cir. 1964); and, Lewis v. Mobil Oil Corporation, 438 F.2d 500 (8th Cir. 1971); and, Jay V. Zimmerman Company v. General Mills, Inc., 327 F. Supp. 1198 (E.D.Mo.1971).
Under the evidence Chemco is entitled to recover as consequential damages "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." 7 C Ark.Stats.Annot. § 85-2-715(2)(a). Franklin had been intimately aware of the intended use of Hyvar-X, that it would be the eradicant applied to ditch banks under contract. The Arkansas state court judgment for breach of the application contract and Grady-Gould's recovery in that suit was a possible loss of which Franklin had reason to know would result from a Hyvar-X failure. Du Pont is liable for the judgment recovered in the Arkansas state court by Grady-Gould, and discharged by Aetna, $30,940.00, plus the attorney's fees for the defense of the Grady-Gould claim, $2,561.89 paid by Chemco. See, KLPR T.V., Inc. v. Visual Electronics Corporation, 327 F.Supp. 315, 327 (W.D.Ark.1971), mod'd on other grounds, 465 F.2d 1382 (8th Cir. 1972); Jay V. Zimmerman Company v. General Mills, Inc., 327 F.Supp. 1198, 1205 (E.D.Mo.1971); Gambino v. United Fruit Co., 6 UCC Rep.Serv. 1056, 1057 (S.D.N.Y.1969); cf., Safeway Stores, Inc. v. L. D. Schreiber Cheese Company, 326 F.Supp 504, 509 (W.D. Mo.1971), reversed on other grounds, 457 F.2d 962 (8th Cir. 1972).
This memorandum is intended as the findings of fact required by Rule 52, Federal Rules of Civil Procedure.
NOTES
[1] (1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
[2] (1) Unless excluded or modified (Section 2-316 [§ 85-2-316]), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as . . . (c) are fit for the ordinary purposes for which such goods are used.
The evidence is clear that du Pont is a "merchant" as defined by § 85-2-104(1).