James WILSON, M. D., ECG Systems, Inc., Appellees,

v.

MARQUETTE ELECTRONICS, INC., a corporation, Appellant.

No. 79–1906.

United States Court of Appeals, Eighth Circuit.

Submitted April 16, 1980.

Decided July 18, 1980.

Rehearing Denied Aug. 19, 1980.

Melvin S. Newman, Prince, Schoenberg, Fisher & Newman, Chicago, Ill., argued, Daniel E. Beederman, Chicago, Ill., and Walter R. Niblock, Niblock & Odom, Fayetteville, Ark., on brief, for appellant.

Troy R. Douglas, Fort Smith, Ark., argued, Garry L. Brewer, Little Rock, Ark., on brief, for appellees.

Before STEPHENSON, Circuit Judge, KUNZIG,* Court of Claims Judge, and McMILLIAN, Circuit Judge.

STEPHENSON, Circuit Judge.

Defendant-appellant Marquette Electronics (Seller) appeals from the decision by the district court[1] finding the existence and breach of express and implied warranties in the sale of goods, and awarding damages to plaintiff-appellee ECG Systems, Inc. (Buyer). The district court dismissed the complaint as to the other plaintiff, James Wilson, M.D., and there is no appeal from that decision. We affirm the district court's finding of the existence and breach of warranties, and affirm as modified the award of damages.

## I. Background

Seller is engaged in the manufacture, sale, and servicing of computer assisted electrocardiographic equipment. Seller manufactures patient carts and exercise stress testing equipment. These are directly connected to the patient and measure electrical impulses produced by the patient's coronary system, and provide a graphic display (ECG). Seller also manufactures computer assisted ECG analysis systems which receive patient data from the patient carts via telephone lines, analyze and interpret the data, and give a print-out for the physician's use.

On October 2, 1974, Dr. Wilson ordered one such system for Buyer,[2] called the Marquette Universal Systems for Electrocardiography (MUSE). Buyer was engaged in the business of processing ECGs for hospitals and clinics, and desired the MUSE to provide computer analysis of ECGs to various hospitals and clinics throughout Little Rock, Arkansas and the surrounding region.

Seller first sent Buyer a quotation for $120,350 but on October 18, 1974, sent a superseding quotation of $99,950 for the same MUSE system without the Option 81.[3] The equipment was actually sold to Professional Leasing Company, Inc., which leased it to Buyer, who in 1979 obtained title to the equipment. This MUSE system was installed on Buyer's premises by Seller and became operational in January 1975. This was the first system of this kind Buyer had purchased, though in the past Seller had sold him some of its other merchandise.

Dr. Wilson testified that the MUSE experienced considerable and repeated downtime which required various modifications or additions. Finally, on March 23, 1976, the central computer of this MUSE (MUSE I) was replaced. The new system (MUSE II) was identical to MUSE I except it had a larger disc drive permitting greater programing capability. Seller charged Buyer $8000 for the larger disc. Problems continued with the MUSE II and Buyer brought this action on November 25, 1977.

The district court concluded there were no written warranties or disclaimers made by Seller, and that in making the sale certain oral express warranties became part of the agreement. The district court also found the existence of implied warranties of merchantability and fitness for a particular purpose as defined in Ark.Stat.Ann. §§ 85–2–314 and 315. The court then found that some of the express and implied warranties had been breached:

> Wilson's practice of cardiology, which is apparently conducted under the name Cardiology Associates, P.A.

* The Honorable Robert L. Kunzig, Judge, United States Court of Claims, sitting by designation.

1. The Honorable William R. Overton, United States District Judge for the Eastern District of Arkansas.

2. Buyer, ECG Systems, Inc., is a successor corporation to Electrocardiogram Systems, Inc., which is successor to James Wilson, M.D., P.A. Dr. Wilson is an employee and incorporator of all three corporations. Buyer is a corporation in the business of processing electrocardiograms for third parties; it is separate from Dr.

3. The manual states Option 81 does not necessarily increase the throughput of the system, but it solves the problem of tying up the telephone lines by providing a second interface doubling the number of incoming lines to six. Thus its primary advantage is that it eliminates "busy signals" to service subscribers. This may or may not increase the system's capacity, depending upon individual circumstances.

## IX.

The Court finds by a preponderance of the evidence that express warranties were breached in the following particulars:

1. The system was capable of delivering only 5,000 through-puts per month as opposed to 10,000 through-puts per month as represented.

2. The system would not operate in the office building environment of the Doctors' Building as represented.

3. The system was unreliable and experienced an indeterminate number of breakdowns, many for time periods in excess of 24 hours.

## X.

The Court finds by a preponderance of the evidence that Dr. Wilson relied upon the seller's skill and judgment to supply the system; that the defendant knew of the plaintiff's particular requirements and purported to sell a system which satisfied those requirements. The implied warranties created thereby were breached in the following particulars:

1. The equipment wouldn't operate in the office environment;

2. The power source was inadequate;

3. The system was unreasonably unreliable; and

4. The system would not perform all the functions required of it by plaintiff and specified in the pre-sale discussions nor did the system have the capacities represented.

## XI.

The Court finds by a preponderance of the evidence that the warranty of merchantability was breached in the following particular:

1. The defendant was a merchant with respect to computer systems and the computer system sold to plaintiff was not fit for the ordinary purposes for which such goods are used.

*Wilson v. Marquette Electronics, Inc.,* No. LR–C–77–338, slip op. at 3–4 (E.D.Ark.

Aug. 16, 1979). The district court concluded the Seller had notice of the breach, and awarded Buyer damages of $79,485.

On appeal, Seller argues that the district court was clearly erroneous in its findings that (1) Buyer established the existence of express and implied warranties; (2) Seller had breached any of its warranties; (3) Buyer had given notice of the breach to Seller; and (4) Buyer had proven damages which were proximately caused by the breach.

### II. Existence of Warranties

#### A. *Express Warranties*

Seller first contends there is insufficient evidence to establish the existence of oral express warranties. Ark.Stat.Ann. § 85–2–313(1) provides that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." The district court, relying primarily on the testimony of Dr. Wilson, determined that Seller had created, *inter alia*, the following oral express warranties:

1. That the system, Muse I, had through-put capability of 10,000 EKGs per month.

2. That the system would not have "down time" of more than 24 hours over 2 times per year.

3. That service given would be priority service.

4. That the equipment would operate in the environment of the Doctors' Building office facility located on University Avenue in Little Rock on existing power facilities and within temperature ranges of 65° to 80° Fahrenheit.

*Wilson v. Marquette Electronics, Inc., supra*, slip op. at 2.

Seller contends that there was insufficient evidence to establish the existence of the oral warranties; and in the alternative that a written manual given to Buyer was a written agreement which cannot be contra-

dicted by parol evidence. We reject both contentions.

■ We have examined the trial transcript and exhibits and cannot say the trial court was clearly erroneous in concluding that statements made by seller were affirmations of fact or promises which became a basis of the bargain. "It is well recognized that an express warranty may be inferred from statements and affirmations by a seller relating to the quality and condition of his goods, which induce the purchase and on which the buyer relies and the seller intended that the buyer should do so." *Little Rock School District v. Celotex Corp.*, 574 S.W.2d 669, 673 (Ark.1979). *See Chemco Industrial Applicators Co. v. E. I. du Pont de Nemours & Co.*, 366 F.Supp. 278 (E.D. Mo.1973). There was conflicting evidence and testimony given to the district court, especially concerning capacity, and it is of course for the district court to determine the weight of the evidence and credibility of the witnesses. *See, e. g., KLPR TV, Inc. v. Visual Electronics Corp.*, 465 F.2d 1382, 1386 (8th Cir. 1972).

■ Concerning the existence of oral express warranties, Seller's alternative argument is that the evidence of these warranties was admitted in violation of the parol evidence rule, Ark.Stat.Ann. § 85–2–202. We disagree. Initially, section 85–2–202 applies only to "a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein." The relevant provision in the manual, which Seller contends contradicts the oral express warranties, states: "And after all that, you still ask the question of throughput? A guess would be anywhere from 300 to 700 per 8 hour day. But remember . . . that's just a guess!" There was no evidence that indicated the parties intended the manual or this sentence in the manual to be a final expression of their agreement. Therefore the parol warranties are not barred. *See Lake Village Implement Co. v. Cox*, 252 Ark. 224, 478 S.W.2d 36, 40–41 (1972); *Loe v. McHargue*, 394 S.W.2d 475, 239 Ark. 793, 476–77 (Ark.1965).

■ Moreover, we do not find the terms in the manual contradictory to the parol warranties made by Seller. The district court found the manual indicated the system had a theoretical capacity in excess of 15,000 throughputs. Seller argues that because the manual states that its estimate is only a guess, for the Seller to make any oral express warranty as to capacity is contradictory to the manual. However, like the district court, we are unable to see why oral statements of capacity admittedly within the range of throughput capacity "guessed" by the manual are inconsistent with the manual. Instead, the statements appear to be more akin to "evidence of consistent additional terms" which section 85–2–202(b) allows to explain or supplement the writing. We therefore affirm the district court's findings of oral express warranties.

## B. *Implied Warranties*

■ The district court also found existence of implied warranties of fitness for a particular purpose. Ark.Stat.Ann. § 85–2–315 provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

In examining this Arkansas statute, this court has stated:

> Under this provision of the Code, there are two requirements for an implied warranty of fitness: (1) that the seller have "reason to know" of the use for which the goods are purchased, and (2) that the buyer relies on the seller's expertise in supplying the proper product.

*Lewis v. Mobil Oil Corp.*, 438 F.2d 500, 504 (8th Cir. 1971). *See Chemco Industrial Applicators Co. v. E. I. du Pont de Nemours & Co., supra*, 366 F.Supp. at 284. The district court found both reliance on the Seller's expertise by Buyer, and knowledge of Buy-

er's purpose by Seller. Seller argues, however, that Buyer had no particular purpose for the MUSE other than its standard use. Official Comment 2 to Ark.Stat.Ann. § 85–2–315 states:

A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question.

We conclude the district court's holding that Buyer's use differed from the ordinary use of a MUSE—because Seller was providing a system for processing ECGs around the clock, unattended, in the environment of Buyer's office and satisfying Buyer's minimum capacity requirements—is not clearly erroneous. *See DeLamar Motor Co. v. White*, 249 Ark. 708, 460 S.W.2d 802, 803–04 (1970). *See also Lewis v. Mobil Oil Corp., supra*, 438 F.2d at 504 (existence of implied warranty of fitness where buyer made it known oil was purchased for his hydraulic system, that he didn't know which oil to use, and he was relying on Mobil to supply a proper product).[4]

■ Seller does not argue that an implied warranty of merchantability did not arise, but alleges that along with the other express and implied warranties it was excluded or modified by the parties' conduct. Buyer had purchased equipment from Seller in 1973, and at that time a written warranty Seller refers to as its "standard warranty" was given. Seller argues that Buyer was therefore familiar with Seller's standard warranty, and aware it accompanied sales made by Seller, and therefore a course of dealing had been established between the parties. The application of the standard warranty is relevant here because it contains the following disclaimer: "This warranty is given by MARQUETTE in lieu of all other warranties, expressed or implied." The Seller argues that the course of the parties' conduct indicated they believed this disclaimer to be included in the agreement.

Ark.Stat.Ann. § 85–2–316(3)(c) provides that *implied* warranties can be excluded or modified by a course of dealings or course of performance or usage of trade. Section 85–1–205(1) defines "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."

The relatively few sales of differing equipment—stress testing machines and patient carts—accompanied by the standard warranty do not in our view establish a course of dealing that would extend the disclaimer provisions to the agreement to purchase the complex MUSE system. The different nature and magnitude of this sale makes any course of dealing which might exist as to the sales of carts and stress testing machines inapplicable to the MUSE agreement. *See Capital Steel Co. v. Foster & Creighton Co.*, 574 S.W.2d 256, 258 (Ark. 1978), which held that the trial court did not err in refusing to submit a course of dealing issue to the jury where prior sales of steel between the parties were much smaller than the sale of a large quantity of steel then in issue.

■ Seller next argues that the course of performance after the sale is important to the meaning of the agreement, see Ark. Stat.Ann. § 85–2–208,[5] and further contends the course of performance indicates

---

**4.** Whether or not the elements necessary to demonstrate an implied warranty of fitness for a particular purpose exist is a question of fact. We note that in any event the express warranties were breached in nearly the identical manner the implied warranties were breached. *See* pages 578–579 *supra*.

**5.** Ark.Stat.Ann. § 85–2–208(1) defines course of performance:

Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

that the parties were operating under the belief that the standard warranty was in effect. The district court disagreed. A letter sent with a copy of the standard warranty to Buyer from Seller some twenty months after the purchase of the MUSE stated in part:

> I have enclosed a copy of our standard warranty policy which was established in 1974 and a copy of our standard service department policies as they apply to customers dated December 29th, 1975. This warranty and these policies should have been made part of your contract with Marquette. They will apply to any new purchases except as modified in this letter.

Such a letter sufficiently negates any evidence which indicated the parties may have been under the assumption the standard warranty applied to the transaction. The unilateral attempt of inserting the warranty into the transaction long after the purchase and delivery is of course ineffective. *Mack Trucks of Arkansas, Inc. v. Jet Asphalt & Rock Co.*, 246 Ark. 101, 437 S.W.2d 459, 463 (Ark.1969).[6]

■ Seller also contends that trade usage operates to exclude or modify the warranties. Usage of trade is defined by Ark.Stat. Ann. § 85–1–205(2):

> A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written

trade code or similar writing the interpretation of the writing is for the court. Seller argues there was uncontradicted evidence at trial that none of the major manufacturers in the computer industry would offer the kind of warranties the district court found were implied in the instant case. Even if this were true, the evidence does not indicate Buyer was the type of party who was or should be aware of these trade customs. Buyer was purchasing its first computer system and was entering a market in which it was relying on Seller's expertise. Buyer was not a member of this industry. We cannot say the district court was clearly erroneous in finding Seller's implied warranties were not effectively disclaimed.

■ In any event, *express* warranties are not included in the provisions of section 85–2–316(2) providing for exclusion or modification of *implied* warranties.[7] While these factors might be relevant in determining the meaning of the agreement, see Ark.Stat.Ann. § 85–2–208(1)–(2), we have already concluded that the district court did not err in finding the oral statements to be express warranties because they formed the basis of the bargain. These express terms control over the course of performance, course of dealing, and usage of trade to the extent they may be inconsistent.[8]

### III. Breach of Warranties

#### A. *Express Warranties*

■ The district court found the express warranties were breached in the following particulars:

---

6. Even if the standard warranty had applied to the agreement, we note the disclaimer is in similar type to the rest of the warranty, and therefore the disclaimer would be ineffective under Arkansas law because it was not conspicuous, and additionally because the word "merchantability" was not specifically referred to in the disclaimer. *See Chemco Ind. App. Co. v. E. I. du Pont de Nemours & Co.*, 366 F.Supp. 278, 285 (E.D.Mo.1973); *DeLamar Motor Co. v. White*, 249 Ark. 708, 460 S.W.2d 802, 804 (1970); *Mack Trucks of Arkansas, Inc. v. Jet Asphalt & Rock Co.*, 246 Ark. 101, 437 S.W.2d 459, 462-63 (1969).

7. This is relevant given the similarity of the express and implied warranties. *See* note 4 *supra.*

8. Ark.Stat.Ann. § 85–1–205(4) provides:
 The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.
 *See* section 85–2–208(2).

1. The system was capable of delivering only 5,000 through-puts per month as opposed to 10,000 through-puts per month as represented.

Support for the court's holding is found in testimony of Dr. Wilson and a representative of Seller that the MUSE sold Buyer in fact had at most a 5,000 throughout capacity, given Buyer's needs. Seller's contention that there was no breach because the MUSE had a theoretical capacity as warranted and because no ECGs went unprocessed is not persuasive. The warranty of capacity concerned capacity for Buyer's purposes, and although no ECGs went unprocessed, evidence indicated that some ECGs had to be processed manually.

2. The system would not operate in the office building environment of the Doctors' Building as represented.

Seller states that evidence showing Buyer moved its offices to house the MUSE on the suggestion of Seller's representative does not show that the original environment was inadequate, so no breach occurred. The district court disagreed and we cannot say its findings were clearly erroneous.

3. The system was unreliable and experienced an indeterminate number of breakdowns, many for time periods in excess of 24 hours.

■ Seller contends that Buyer cannot accept the benefits of Seller's written warranty which gave Buyer service free of charges and then claim breach and seek damages for Seller's failure to have the equipment operating within a prescribed period of time. This contention is without merit. Buyer has never denied Seller at-tempted to repair the MUSE and keep it operational. We agree with Buyer that this does not prove an express warranty for limited down-time was not breached, or that the parties were operating under the standard written warranty. The evidence is sufficient to support the court's findings of excessive down-time and system unreliability and the breach of the express warranty that these would not occur.

B. *Implied Warranties*

■ The district court found that implied warranties of merchantability and fitness for a particular purpose were breached in essentially the same manner as the express warranties.[9] Our discussion in Part III A, *supra*, is therefore applicable here, and we conclude that the district court was not clearly erroneous in its findings of breach of implied warranties.

IV. Notice of Breach

■ The district court found evidence of numerous *instances where Buyer gave notice to Seller of its dissatisfaction.*[10] It examined the purpose of the notice requirement in Ark.Stat.Ann. § 85–2–607(3), and determined that the notice here gave Seller the opportunity to minimize losses, and did not prejudice Seller by forcing it to defend a stale claim. The purposes of the notice requirement satisfied, the court concluded proper notice was given.

■ Seller argues, however, that notice of dissatisfaction is not notice of breach as required by section 85–2–607(3). The question of adequate notice is one of fact. *Cotner v. International Harvester Co.*, 260 Ark.

---

9. *See* pages 578 -579 *supra*.

10. The district court also concluded:

The Court finds that continuing deficiencies in the system as delivered existed over a period of 2 years and included a complete change out of the computer by defendant in an effort to correct a system which was admittedly unsatisfactory. The plaintiff continued to operate the system with the reasonable expectation that the defects would be corrected and such continued operation cannot be construed as an "acceptance" which bars his recovery.

*Wilson v. Marquette Electronics, Inc.*, No. LR–C 77–338, slip op. at 4 (E.D.Ark. Aug. 16, 1979). We think it clear here that Buyer had accepted the MUSE, but such acceptance in no way bars an action for breach of warranty. *See Hanna Lumber Co. v. Neff*, 579 S.W.2d 95, 98 (Ark.1979). *Jones v. Atkins*, 254 Ark. 472, 494 S.W.2d 448, 451 (1973). The district court's finding of unsatisfactory attempts to correct the system is relevant to whether there was notice of the breach, however. *See, Smart Chevrolet Co. v. Davis*, 558 S.W.2d 147, 148 (Ark.1977).

885, 545 S.W.2d 627, 630 (1977); *L. A. Green Seed Co. of Arkansas v. Williams*, 246 Ark. 463, 438 S.W.2d 717, 720 (1969). The Arkansas Supreme Court has recognized:

> It is true that the requirements of notification are not stringent. Notice need only be sufficient to inform the seller that the transaction is claimed to involve a breach and thus to open the way for negotiation of a normal settlement. It must, however, be sufficient to let the seller know that the transaction is still troublesome and must be watched.

*Cotner v. International Harvester Co., supra*, 545 S.W.2d at 630. In discussing section 2–607, Comment 4,[11] it has been noted:

> Quite clearly the drafters intended a loose test; a scribbled note on a bit of toilet paper will do:
>
> \* \* \* \* \* \*
>
> Under this comment, it is difficult to conceive of words which, if put in writing, would not satisfy the notice requirement of 2–607. Indeed, a letter containing anything but the most exaggerated encomiums would seem to tell the seller that the transaction "is still troublesome and must be watched."

J. White & R. Summers, Uniform Commercial Code 347–48 (1972). *See* 2 R. Anderson, Uniform Commercial Code 216–19 (2d ed. 1971). The Arkansas Supreme Court has also stated, however, "[t]he notice must be more than a complaint. It must, either directly or inferentially, inform the seller that the buyer demands damages upon an asserted claim of breach of warranty." *Cotner v. International Harvester Co., supra*, 545 S.W.2d at 630.

 We acknowledge it is a close question as to whether adequate notice was given. However, given the purposes for the requirement, and the fact the requirement is to be liberally construed, we cannot say the district court was clearly erroneous. We have ruled that notice was sufficient under Ark.Stat.Ann. § 85–2–607(3) in very similar circumstances. After quoting section 85–2–607 Comment 4, this court stated:

> Here there is not the slightest suggestion of bad faith on the part of the plaintiff. Furthermore the evidence shows that soon after using Ambrex 810, plaintiff notified the Mobil dealer, Rowe, that he wasn't sure if a proper oil was being supplied, and was constantly in touch with Rowe about his problems thereafter. Mobil certainly had notice that the "transaction [was] still troublesome and must be watched." Defendant continued to supply Ambrex 810. Therefore we cannot conclude that any damages must be barred under this section.

*Lewis v. Mobil Oil Corp., supra*, 438 F.2d at 509. *Accord, Smart Chevrolet Co. v. Davis*, 558 S.W.2d 147, 148 (Ark.1977).

## V. Damages

 The district court awarded damages of $79,845 to Buyer, ECG Systems, Inc., the corporation plaintiff, and dismissed Dr. Wilson individually as a plaintiff.[12]

---

11. Ark.Stat.Ann. § 85–2–607, Comment 4 provides in relevant part:

> [T]he rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.
>
> The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

12. The district court awarded damages as follows: (1) $450 for special fifty amp line to avoid interference by use of other outlets; (2) $4,635 for installation of uninterruptible power source needed to overcome storm related failure; (3) $20,400 as the difference between the value of the MUSE sold Dr. Wilson, and the value of the MUSE as warranted; (4) $10,000 for moving expense and air conditioning needed for the system to operate in a more controlled environment; (5) $40,000 for the "lost time" Dr. Wilson spent away from his private cardiology practice because of the failure of the

The court awarded $20,400 for direct damages, based on what it found to be the difference between the value of the MUSE with a 5,000 throughput capacity, and the value of a MUSE with a 10,000 throughput capacity as warranted.[13] The court found such capacity could be achieved by adding the Option 81 to the MUSE. Seller argues that Buyer's position had been that more than the Option 81 was needed to achieve 10,000 throughputs, and therefore this measure of damages is improper. Seller's witness testified the Option 81 could double capacity, and Seller itself argued before the district court that its understanding of the evidence was that the Option 81 would double capacity.[14] We conclude there was sufficient evidence adduced at trial for the court to find that if the MUSE had been sold equipped with the Option 81, then it could have performed with the warranted capacity. The direct damage award of $20,-400 is affirmed.

■ The district court also awarded consequential damages of $450 for Buyer's installation of a fifty amp line; $4,635 for an uninterruptible power source; and $4,000 for a replacement to the central computer.[15] We have examined Seller's challenge to these awards under Ark.Stat.Ann. § 85–2–715 as unforeseeable and without adequate evidentiary support. We disagree with Seller and cannot say the district court erred in making these awards.

MUSE to perform as warranted; (6) $4,000 for additional money charged for the MUSE II.

13. Ark.Stat.Ann. § 85–2–714(2) provides "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show approximate damages of a different amount."

14. "MR. NEWMAN: Your Honor, I believe that the addition of an interface will increase the capacity one hundred percent. That is my understanding of the testimony. That is my understanding of the product."

15. See items (1), (2) and (6) note 12 supra.

■ The district court also awarded $10,000 to Buyer for expenses in moving the MUSE to a more suitable office, and providing air conditioning so that the MUSE could operate in a more controlled environment as suggested by Seller's repairman. Seller attacks this as an unforeseeable cost and awarded by the court without adequate proof of the cost, if any, incurred by the corporation. We agree with Buyer that if the MUSE would not properly function in the Buyer's office as warranted, other arrangements would have to be made. While there was some question as to whether this cost was incurred by Buyer or Dr. Wilson personally, we are not in a position to disagree with the district court's interpretation of this testimony.[16]

The final element of damages awarded Buyer by the district court was $40,000 for "lost time." This award represents Dr. Wilson's time away from his private practice incurred because of the increased time spent with the MUSE due to its failure to operate as warranted. It was based on testimony indicating Dr. Wilson intended to spend about ten hours per week with the system, but instead had to spend twenty hours per week. The district court noted that proof of Dr. Wilson's personal time was not entirely satisfactory because many of the functions he performed were those of a service man and not a physician. The district court concluded that $40,000 was a reasonable sum for this lost time. We con-

16. The disputed portion of the testimony appears at T 49:

Q What did you do when you found it was not feasible to upgrade the air conditioning in the Doctors' Building?

A I obtained space for the computer on lease in St. Vincent's Infirmary and provided at my own expense a dedicated air conditioning unit which would operate with the hospital's air conditioning to provide narrower and more dependable temperature control.

\* \* \* \* \* \*

Q What expense did you incur in moving and purchasing air conditioning?

A The cost of the air conditioning equipment was about $8,500.00. The move itself in terms of expenses paid out was about $1,500.00.

(emphasis added).

clude none of the $40,000 is recoverable under section 85–2–715 as damages for the breach of warranties.

Initially, Seller did not warrant that Dr. Wilson would have to spend no more than ten hours with the MUSE per week. The evidence was insufficient to show that, in the absence of the breach of warranty concerning down-time, Dr. Wilson would have been required to spend only ten hours per week with the machine. There is no tangible method for the court to use in arriving at its $40,000 figure. Section 85–2–715 requires a reasonably certain method for the calculation of damages. *Karlen v. Butler Manufacturing Co.*, 526 F.2d 1373, 1380 (8th Cir. 1975). *See* J. White & R. Summers, *supra*, at 321–22.

Our concern with the $40,000 "lost time" award goes deeper, however. There was no evidence adduced at trial which indicated that the corporate Buyer lost any money due to the extra time Dr. Wilson was forced to spend on this segment of his business. Dr. Wilson testified he personally spent time away from his private practice of cardiology because of the MUSE failures. However, this does not indicate that Buyer was damaged absent evidence it was paying Dr. Wilson for the extra time he spent handling ECGs because of the warranty breach. No such evidence appears in the record. Dr. Wilson individually was a plaintiff to this action, and the district court dismissed his individual claims. That portion of the district court's holding was not appealed.

Buyer argues that where an officer of the corporation has to perform extraordinary or special services for the corporation, an implied contract to pay for these services arises. It cites *Mortensen v. Ballard*, 218 Ark. 459, 236 S.W.2d 1006 (1951) in support of this proposition. That case held that where an officer of a corporation performed duties at the instance of the board of directors, and the board's resolution authorizing that action is improper, nevertheless the officer has a claim against the corporation in quantum meruit. The rule followed in that case allowed recovery in circumstances where the duties are "entirely outside the line and scope of his duties as such director or officer, [and] performed at the instance of its officers, * * * upon an implied promise to pay for such services." *Id.* at 1009 (quoting 13 Am.Jur. 976). The evidence adduced at trial in the instant case is insufficient to satisfy the requirements of this rule; there is no evidence that Dr. Wilson requested payment, that payment was made, or that the parties intended such a payment to be made. We conclude there was insufficient evidence to support Buyer's claim for damages based on the "lost time" incurred by Dr. Wilson, and accordingly reduce the damage award by $40,000. *See Karlen v. Butler Manufacturing Co.*, *supra*, 526 F.2d at 1380.

Judgment in favor of ECG Systems, Inc. for the modified sum of $39,485 is affirmed.